CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, ET AL. *v.* STEVEN G. COOPERMAN

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, ET AL. *v.* NANCY COOPERMAN
(SC 18084)

Norcott, Katz, Palmer, Zarella and Schaller, Js.

Argued March 14—officially released November 4, 2008

*William A. Meehan*, with whom was *Leo W. Fraser, III*, for the appellants (plaintiffs).

*Daniel J. Klau*, with whom was *Harold J. Pickerstein* for the appellee (defendant Nancy Cooperman).

*John M. Wolfson* for the appellee (defendant Steven G. Cooperman).

*Opinion*

SCHALLER, J. This appeal arises out of two separate actions brought by the plaintiffs, Certain Underwriters at Lloyd's, London (underwriters), AXA Nordstern Art Insurance Corporation (AXA) and National Union Fire Insurance Company of Pittsburgh (National), against, respectively, the defendant, Steven G. Cooperman (Steven), and the defendant, Nancy Cooperman (Nancy), alleging fraudulent conveyance, statutory theft, conversion and conspiracy, and requesting damages and equi-

table relief. The cases were consolidated for trial. After a trial to the court, the trial court concluded that the plaintiffs had not proved their claim of fraudulent conveyance. The trial court also concluded that the plaintiffs had failed to prove their claims of statutory theft and conversion, and, in addition, those claims and the plaintiffs' requests for equitable relief were barred by the applicable statute of limitations. Finally, the trial court concluded that because the plaintiffs could not sustain an action for fraudulent conveyance, statutory theft or conversion, the plaintiffs could not sustain an action for conspiracy. The plaintiffs then brought this appeal,[1] claiming that the trial court improperly concluded that: (1) the plaintiffs had failed to prove fraudulent conveyance against either defendant; (2) the plaintiffs had failed to prove their claims of statutory theft and conversion against Nancy; and (3) the statute of limitations barred the plaintiffs' claims of statutory theft and conversion and their claims for equitable relief against Nancy. We conclude that the trial court properly concluded that the plaintiffs had failed to prove their claims of fraudulent conveyance. We further conclude that the trial court properly determined that the claims of statutory theft and conversion and for equitable relief against Nancy were time barred. We need not address, therefore, the merits of the plaintiffs' claim that the trial court improperly determined that the plaintiffs had failed to prove those claims. Accordingly, we affirm the judgments of the trial court.

The trial court found the following facts. During the 1980s and 1990s, Steven acquired a painting by Pablo Picasso entitled "Nude Before a Mirror" and a painting by Claude Monet entitled "The Customs Officer's Cabin at Pourville." The paintings were insured by the plain-

---

[1] The plaintiffs appealed from the judgments of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

tiffs for $5 million and $7.5 million, respectively. In July, 1992, Steven reported the paintings stolen from the Los Angeles, California residence that he shared with his wife, Nancy. Thereafter, Steven filed a claim for the loss of the paintings under insurance policies held by the plaintiffs. When the plaintiffs denied the claim, Steven commenced an action alleging bad faith breach of contract against the plaintiffs in California Superior Court. The plaintiffs ultimately agreed to settle that case, and paid Steven $17.5 million.[2] The defendants subsequently used approximately $5.8 million of the settlement to build and furnish a residence at 245 Brambly Hedge Circle in Fairfield.[3] An additional $2.25 million of the settlement was deposited in an account at the investment firm of Gruber and McBaine (Gruber), in a limited partnership known as Lagunitas Partners, Limited Partnership (Lagunitas).[4] Undisputed testimony indicates that by July, 1999, the investment had earned an additional $5.8 million.

In November, 1998, Steven was indicted in the United States District Court for the Central District of California on various fraud charges stemming from his insurance claim against the plaintiffs. The government alleged that the theft of the paintings had been staged for the purposes of committing insurance fraud. Steven ultimately was convicted in July, 1999, of eighteen counts of insurance fraud in connection with the claimed theft of the paintings, as well as tax evasion for failure to pay taxes on $5 million of the settlement

---

[2] Underwriters paid $8.75 million; AXA paid $8,312,500; and National paid $437,500.

[3] It is undisputed that both Steven and Nancy held equal ownership interests in this property.

[4] The plaintiffs contend in their brief that the defendants used the $17.5 million settlement to pay off a $3.295 million debt secured by a lien on the defendants' art collection and a mortgage on a property on Coleytown Road in Westport, and to pay off three mortgage loans totaling $2.4 million on two pieces of residential real estate located in California.

proceeds. Nancy was not charged with any involvement in the insurance fraud or subsequent tax evasion.

Immediately following his conviction, Steven filed posttrial motions that delayed his sentencing until 2001. Undisputed testimony reveals that, after the conviction, the District Court increased Steven's bail to $10 million, $5 million of which was to be paid to the clerk of the District Court in cash. On July 23, 1999, Nancy partially liquidated the Lagunitas shares to raise the required cash portion of the bail.[5] The remainder of the bail was secured with mortgages placed on Connecticut properties owned by the defendants. In July, 1999, $5 million was wired from the Gruber account to the clerk of the District Court.

In 2001, with his posttrial motions still pending, Steven entered into plea negotiations with the United States government and the Internal Revenue Service (IRS). In exchange for a shorter prison sentence, Steven agreed to pay restitution to the plaintiffs in the amount of $3.5 million, $1.05 million of which was to be made within fifteen days of his sentencing, and the remaining payments to be spread out over ten years. In addition, Steven admitted liability for $3 million in unpaid taxes, interest and penalties. Payment to the IRS was to be made within fifteen days after the clerk of the District Court released the $5 million, plus interest, held as bail.

Because the majority of his assets were in real estate and other property in which he shared ownership with Nancy, Steven had insufficient cash to pay the agreed upon amounts to the plaintiffs and the IRS. Specifically, he needed an additional $2.6 million in order to pay the

---

[5] Undisputed testimony reveals that Steven sent a letter to Gruber indicating his "consent to the withdrawals from the capital account of Nancy . . . in the partnership to the extent necessary to release any community property interest I may have in the partnership in accordance with the request and instructions of Nancy . . . dated July 23rd, 1999."

$4.05 million owed to the plaintiffs and the IRS. Nancy possessed sufficient cash, but was unwilling to provide Steven with the cash unless she received assets in return.[6] Accordingly, the defendants, with their attorneys, negotiated an agreement for a sale by Steven to Nancy of certain assets (sale of assets).

Pursuant to the sale of assets agreement, Nancy agreed to transfer to Steven $2.6 million of the $5 million held by the District Court as bail. In exchange, Steven assigned to Nancy his interest in the Brambly Hedge Circle property; all of his interest in certain art, antiques, and furnishings; all of his interest in certain real estate investments and limited partnership interests; and all of his interest in certain life insurance policies and other investment accounts. The sale of assets took place on September 19, 2001.[7]

Meanwhile, in July, 2000, after Steven's conviction but prior to his sentencing, the plaintiffs had commenced a civil action in California Superior Court against Steven seeking to recover damages resulting from the insurance fraud. On February 13, 2002, the California Superior Court rendered judgment in favor of the plaintiffs in the civil action, and awarded the plaintiffs $22 million in damages.[8]

---

[6] The record reveals that the defendants' marital relationship was strained as the result of Steven's criminal conduct, and Nancy ultimately brought a dissolution action in October, 2002.

[7] Undisputed testimony indicates that the clerk of the District Court remitted $2.6 million of the $5 million to the IRS. In January, 2002, the clerk of the District Court remitted $2,875,109 to Nancy. This amount was the balance of the $5 million still held in bail—$2.4 million—plus interest. Nancy used this money to purchase a property in Fairfield that she still owns; and to fund other investment accounts. Nancy liquidated the remaining Lagunitas shares in 2002, and received approximately $978,000.

[8] To date, the plaintiffs have recovered $8.05 million in restitution through various sources. The plaintiffs sold the Picasso painting and the Monet painting and received $4.3 million in total, and the plaintiffs recovered $3.5 million from Steven as a result of his plea bargain agreement with the United States government. In addition, the plaintiffs have received $250,000 from one of Steven's coconspirators in the theft of the Picasso and Monet.

Thereafter, the plaintiffs commenced the present separate actions against Steven and Nancy. Each eight count complaint alleged that the sale of assets constituted a fraudulent conveyance from Steven to Nancy, in violation of the common law (count one), and that the sale of assets constituted a violation of the Uniform Fraudulent Transfer Act, General Statutes § 52-552 et seq.[9] (count two). The complaints further alleged that the defendants intentionally had deprived the plaintiffs of funds and other assets, which the defendants diverted to their own use and accounts, thus constituting statutory theft in violation of General Statutes § 52-564[10] (count three), and that the defendants' actions constituted unjust enrichment (count four). In addition, the plaintiffs' complaints sought an accounting of all property purchased and payments made with the funds acquired by Steven's insurance fraud (count five), and asked that a constructive trust be imposed on all property and money that the defendants had received as a result of Steven's insurance fraud (count six). Finally, the complaints alleged that the defendants' actions constituted civil conspiracy (count seven) and conversion (count eight).[11] The actions were consolidated for trial.

[9] General Statutes § 52-552e (a) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

[10] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

[11] The conversion allegation against Nancy claimed that Nancy was in wrongful possession of funds stolen by Steven, and that the plaintiffs had made adequate demand for the return of their property. With respect to Steven, the plaintiffs alleged that Steven's actions constituted conversion.

Thereafter, the consolidated cases were tried to the court. The trial court concluded in each case that: (1) the 2001 sale of assets was not a fraudulent conveyance; (2) the plaintiffs had not proved that the 2001 sale of assets constituted statutory theft or conversion; (3) the plaintiffs' claims of statutory theft and conversion, as well as their requests for equitable relief, were barred by the applicable statute of limitations; and (4) the plaintiffs could not sustain an action for conspiracy because they could not sustain the underlying actions for fraudulent conveyance, statutory theft, or conversion. Accordingly, the trial court rendered judgments for the defendants. On appeal, the plaintiffs claim that the trial court improperly concluded that: (1) the sale of assets between the defendants did not constitute a fraudulent transfer; (2) the plaintiffs had failed to prove their statutory theft or conversion claims as to Nancy; and (3) the statute of limitations bars the plaintiffs' claims of statutory theft and conversion and their claims for equitable relief against Nancy. We reject the first and third claims and, accordingly, do not reach the second claim.

I

We first address the plaintiffs' claim that the trial court improperly concluded that the sale of assets did not constitute a fraudulent transfer. Specifically, the plaintiffs contend that the trial court improperly: (1) concluded that Nancy paid Steven $2.6 million when she legally did not own the funds that she transferred to him because they represented her interest in the proceeds of Steven's insurance fraud; (2) failed to recognize the effect of Steven's community property interest in the Lagunitas shares in determining whether there had been a reasonably equivalent exchange of value; (3) failed to consider Nancy's federal tax liability in determining whether there had been a reasonably equivalent exchange of value; and (4) applied a subjective

measure of value in determining whether there had been a reasonably equivalent exchange of value. The plaintiffs also claim that the trial court's finding of reasonable value was clearly erroneous. We reject each claim and affirm the judgments of the trial court.

The following additional undisputed facts and procedural history are relevant to our resolution of this claim. For valuation of the Brambly Hedge Circle property, the defendants relied on an appraisal prepared in 1999, for the purpose of obtaining collateral to secure a bond for Steven's bail of $10 million, for which purpose the appraiser had been instructed to be "generous." This appraisal set the fair market value of the Brambly Hedge Circle property at $4.25 million. On March 25, 2000, Safeco Insurance Company conducted a second appraisal of the Brambly Hedge Circle property, and valued the property at $2.352 million, based on the property's replacement cost.[12] On the basis of these two appraisals, the trial court concluded that the value of Steven's one-half interest in the Brambly Hedge Circle property was $2.125 million, which was one half of the 1999 appraisal.

With respect to the art, antiques and furnishings transferred to Nancy under the sale of assets agreement, the defendants had agreed at the time of the transfer that the value of these assets was $475,000. In support of this valuation, they had relied on a financial affidavit that had been prepared by Steven in the spring of 1999 for probation purposes. At trial, the plaintiffs presented expert testimony that this personal property would have had a fair market value of approximately $3.4 million in September, 2001. The defendants' expert, however, opined that the assets had a value of $1,559,560, which

---

[12] It is unclear why the second appraisal was done. On appeal, the plaintiffs do not challenge the validity of the trial court's conclusion with regard to the valuation of the Brambly Hedge Circle property.

should be reduced by 40 to 45 percent to account for the effects of the September 11, 2001 terrorist attacks on the markets for arts and antiques. Applying this discount, the defendants' expert testified that the value of the assets transferred in the sale of assets agreement was $693,496.50.[13] The trial court noted that, in addition to these assets, Steven had transferred to Nancy his interest in certain stocks, partnerships, jewelry and other assets. The trial court did not make any findings as to the value of these assets.

The trial court concluded that, in light of Steven's need "to come up with a large sum of cash quickly to pay the amounts he agreed to pay as part of his sentencing agreement" and "the fact that the property interests he was selling were one-half interests in assets that were co-owned with [Nancy] . . . the agreed upon value of the assets sold by Steven . . . was not unreasonable." The trial court also stated that, "it was undisputed that, at the time of the transfer, Steven . . . did not have the cash available to make the large payments necessary to fulfill the requirements of the sentencing agreement," and, because, at the time, Steven had substantial assets other than those that he had transferred to Nancy, there was no evidence that the sale of assets had been made with any intent to render him unable to meet his obligations. The trial court stated: "Given the testimony of the [defendants] regarding the circumstances of the transfer and the conflicting opinions of the experts regarding the value of the one-half interests in the assets, the court cannot find, by the clear, precise and unequivocal evidence necessary, that the conveyance was made without substantial consideration."[14]

[13] Thus, Steven's 50 percent interest in these assets was worth $346,748.25.

[14] The trial court relied on *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 140–41, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002), in which the Appellate Court stated that "[a] party alleging a fraudulent transfer or conveyance bears the burden of proving either: (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations; or (2) that the convey-

The trial court also addressed the plaintiffs' contention that, because both Steven and Nancy owned the shares in Lagunitas that had been liquidated to raise Steven's bail, "the value paid by [Nancy] was half of the $2.6 million amount because Steven . . . had a one-half interest in the money conveyed by [Nancy]." The court concluded that "although both of their names were on the account, [the defendants] considered the Gruber . . . account assets to be [Nancy's]." With respect to the plaintiffs' claim that "[Nancy] had signed documents declaring her liability for the $3 million IRS liability, so that the value paid by her must be further reduced because she received the benefit of Steven's . . . payment of the [defendants'] joint tax liability," the court concluded that "it was Steven . . . who was convicted of tax evasion, and the sentencing agreement placed the responsibility for paying the $3 million on him alone. [Nancy] was never charged with any criminal liability for failure to pay taxes on the insurance proceeds."

With this background in mind, we turn to the governing law. As we have indicated, in count one of their complaint, the plaintiffs raised a claim of fraudulent conveyance based on the common law and, in count two, they raised a claim based on the Uniform Fraudulent Transfer Act, § 52-552 et seq. A party alleging a fraudulent transfer or conveyance under the common law bears the burden of proving "either: (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations or (2) that the conveyance was made with a fraudulent intent in which the grantee participated."

ance was made with a fraudulent intent in which the grantee participated. . . . Further, the elements of fraudulent conveyance, including whether the defendants acted with fraudulent intent, must be proven by a heightened standard of proof, that of clear, precise and unequivocal evidence." (Citation omitted; internal quotation marks omitted.)

*Bizzoco* v. *Chinitz*, 193 Conn. 304, 312, 476 A.2d 572 (1984). The party seeking to set aside a fraudulent conveyance need not satisfy both of these tests. Id. These are also elements of an action brought pursuant to General Statutes §§ 52-552e (a) and 52-552f (a).[15] Indeed, although the statute provides a broader range of remedies than the common law; see *Robinson* v. *Coughlin*, 266 Conn. 1, 8–9, 830 A.2d 1114 (2003); the Uniform Fraudulent Transfer Act "is largely an adoption and clarification of the standards of the common law of [fraudulent conveyances] . . . . " (Internal quotation marks omitted.) Id., 9. Accordingly, we consider the claims raised in counts one and two of the plaintiffs' complaint together.

"The determination of whether a fraudulent transfer took place is a question of fact and it is axiomatic that [t]he trial court's [factual] findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 359, 880 A.2d 872 (2005). The elements of fraudulent conveyance, including whether the defendants acted with fraudulent intent, must be proven by "clear, precise and unequivocal evidence." (Internal quotation marks omitted.) *Tyers* v.

[15] General Statutes § 52-552f (a) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

*Coma,* 214 Conn. 8, 11, 570 A.2d 186 (1990). With these principles in mind, we turn to the plaintiffs' claims.

### A

We first address the plaintiffs' contention that the $2.6 million that Nancy transferred to Steven did not belong to her because it represented her interest in proceeds of Steven's insurance fraud. Accordingly, the plaintiffs argue, Steven received no value for the assets that he transferred to Nancy. In support of this claim, the plaintiffs rely on *Atlas Assurance Co., Ltd.* v. *Gibbs,* 121 Conn. 188, 192, 183 A. 690 (1936), for the proposition that a thief cannot acquire nor transfer title to stolen property, and on *Giulietti* v. *Giulietti,* 65 Conn. App. 813, 856, 784 A.2d 905, certs. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001), for the proposition that a constructive trust is imposed on property acquired with stolen property.

We are not persuaded. The claim that Nancy had no interest in the $2.6 million that she transferred to Steven could be proven, if at all, only by proving that Nancy had stolen or converted the money used to purchase the Lagunitas shares in 1999. It is clear, therefore, that this is essentially an attempt by the plaintiffs to raise their time barred claims of conversion and statutory theft under another guise. See part III of this opinion. Accordingly, we reject this claim.

### B

We next turn to the plaintiffs' contention that the trial court improperly failed to recognize the legal effect of Steven's community property interest in Lagunitas. We disagree.

The following additional facts are relevant to our resolution of this claim. The deposit contract governing the Gruber account, titled the "Subscription Agreement," was between Lagunitas, the general part-

ners of Lagunitas, Gruber and Nancy. In the agreement, Nancy was presented with a choice of ownership options, including: "individual ownership," "joint tenants with right of survivorship," "trust," "corporation," "tenants-in-common," "partnership," "community property," "custodian for [a] minor" and "other." Nancy indicated that ownership of the partnership interest would be "community property."

The plaintiffs contend that, because the plain terms of the subscription agreement clearly and unambiguously provided that the shares in the Gruber account were community property, the trial court could not reasonably have concluded that Nancy was the sole owner of the shares. See *Levine* v. *Massey*, 232 Conn. 272, 277–78, 654 A.2d 737 (1995) ("[a]lthough ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law" [citations omitted; internal quotation marks omitted]).

We note, however, that interests in property acquired during marriage generally are determined by the law of the domicile when such property is acquired. 15A Am. Jur. 2d 605, Community Property § 18 (2000). It is undisputed that the defendants purchased the Lagunitas shares while their marriage was domiciled in Connecticut, which is not a community property state. See, e.g., *Krafick* v. *Krafick*, 234 Conn. 783, 792, 663 A.2d 365 (1995). Accordingly, although we agree with the plaintiffs that the subscription agreement clearly and unambiguously indicated that Nancy had chosen the community property option when she executed the agreement, we conclude that the meaning of that choice in this context is far from clear. It is possible, for example, that Nancy simply was operating under the mistaken assumption that all property acquired during a

marriage is community property, or that California law governed all of the property acquired by her during her marriage, regardless of where and when the property was acquired or the defendants' intentions regarding the property. In short, although the language of the subscription agreement is undisputed, the meaning of that language is ambiguous and must be resolved by inquiring into the defendants' intent. This was a question of fact for the trial court. See *Levine* v. *Massey*, supra, 232 Conn. 277–78.

As we stated in part I of this decision, the trial court concluded that the defendants intended that the Lagunitas shares would be Nancy's property, not Steven's. This finding was supported by testimony that indicated that both defendants regarded the Lagunitas shares in this manner, as well as testimony from both defendants that Steven had, from time to time, forged Nancy's signature in order to gain funds from the Lagunitas account. Because the trial court's conclusion was reasonably supported by the evidence, we conclude that its finding that Nancy was the sole owner of the Lagunitas shares was not clearly erroneous.

C

We next turn to the plaintiffs' contention that the trial court improperly failed to give effect to Nancy's federal income tax liability in comparing the value of the assets transferred by Nancy and Steven in the sale of assets. We disagree.

The following additional facts are relevant to our resolution of this claim. The defendants filed a joint tax return for 1993, the tax year in question. After Steven's conviction of tax evasion in July, 1999, Nancy signed a closing agreement with the IRS indicating that both she and Steven were liable for the defendants' $3 million tax deficiency.

The plaintiffs contend that, because a closing agreement with the IRS "is binding, 'final and conclusive' as to the taxpayer's liability for taxes, interest and penalties"; see 26 U.S.C. § 7121 (b); the closing agreement signed by Nancy established as a matter of law that she received a benefit from Steven's full payment of the $3 million tax liability. Although we agree with the plaintiffs that the closing agreement appears to establish conclusively that the IRS would have had a legal claim against Nancy if Steven had failed to pay the deficiency, the implications of that fact in this context are not clear. The plaintiffs have cited no authority for the proposition that, when multiple parties stipulate that they are jointly liable to the IRS, full payment by one party, or one party's reimbursement of another party, constitutes a transfer of assets to the nonpaying party as a matter of law, regardless of the intent of the parties to such a transaction or the circumstances of the transaction.[16] Accordingly, we conclude that the trial court was not barred from considering those factors.

As we have indicated, the trial court found that it was Steven, not Nancy, who had been convicted of tax evasion and who had entered into the sentencing agreement requiring him to pay the couple's tax liabil-

---

[16] The plaintiffs point out that a person who pays a joint tax obligation in full may be entitled to contribution from those who share the obligation. See *Estate of McClure* v. *United States*, 288 F.2d 190, 192 (Ct. Cl. 1961) ("[o]ne who is jointly liable with another for income taxes and has been compelled to pay them is entitled to contribution from the other person liable for the taxes"). It does not necessarily follow, however, that persons who share a joint tax obligation cannot enter into an agreement as to how the obligation will be paid or that an innocent person who is found vicariously liable for a tax obligation cannot seek indemnification from an active wrongdoer. Although the taxing authority would not be bound by such an agreement if it was not a party to it, we see no reason why it would not be binding as to the parties and their creditors in the absence of any fraudulent intent.

ity.[17] Thus, the trial court concluded that Steven was fully responsible for the existence of the tax liability and, therefore, it was reasonable for him to agree to pay it in full. The plaintiffs point to no evidence other than the closing agreement in support of their claim that Nancy's payment to Steven must be reduced by the amount of Steven's payment of her tax liability. Accordingly, we conclude that the trial court's determination was supported by the evidence and was not clearly erroneous.

### D

We next turn to the plaintiffs' claim that the trial court improperly applied a subjective measure of value in determining that the sale of assets was for "reasonably equivalent value." General Statutes §§ 52-552e (a) (2) and 52-552f (a). We disagree.

The plaintiffs contend that, in determining reasonably equivalent value, the trial court must consider whether "the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank, N.A.* v. *Metro Communications, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991), cert. denied, 503 U.S. 937, 112 S. Ct. 1476, 117 L. Ed. 2d 620 (1992). They further contend that realizable commercial value is an objective standard that requires the court to ascertain the fair market value of the transferred property, not the forced sale value. Consequently, the plaintiffs claim that the trial court was not authorized to take Steven's particular

---

[17] Although the trial court did not refer to it in its memorandum of decision, Nancy's attorney sent a letter to the IRS in which he confirmed "all parties' undisputed understanding that [Nancy], although a joint signatory to the underlying tax return, was completely unaware of any fraud that may have occurred in the filing of the return. In fact, as I emphasized at our meeting, as a completely 'innocent spouse,' [Nancy] contests that she has any liability for these taxes whatsoever."

circumstances into account in determining whether the sale of assets was for reasonably equivalent value.

Because the plaintiffs never made this claim to the trial court, we conclude that it is unreviewable. See *Gilbert* v. *Beaver Dam Assn. of Stratford, Inc.*, 85 Conn. App. 663, 680, 858 A.2d 860 (2004) ("[f]or this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party" [internal quotation marks omitted]), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005).

E

We turn finally to the plaintiffs' claim that the trial court's finding that the sale of assets was for reasonably equivalent value was grossly inconsistent with the evidence and, therefore, was clearly erroneous. We disagree.

The following additional facts are relevant to our resolution of this claim. The trial court found that, as part of the sale of assets, Nancy had paid Steven $475,000 for art, antiques, furnishings and personal property transferred to her, other than the Brambly Hedge Circle property.[18] In support of its conclusion that this was a reasonable price, the court stated that "[t]he plaintiffs presented . . . expert testimony . . . that the art, antiques and furnishings included in the transfer would have had a fair market value of approximately $3.4 million in September, 2001. [The plaintiffs' expert] testified that he did not take into account any depreciation in the fair market value resulting from the terrorist attacks of September 11, 2001, and that he did not believe that any depreciation had occurred in the market because of the . . . attacks. The defendants'

---

[18] The $2.6 million sale of assets consisted of $475,000 for personal property and $2.125 million for the Brambly Hedge Circle property. The plaintiffs do not challenge the valuation of the Brambly Hedge Circle property on appeal.

expert witness . . . valued the art, antiques and furnishings at $1,559,560 in September, 2001. To this value, [he] applied a 40 [percent] discount for fine arts and a 45 [percent] discount for decorative arts, based upon his opinion as to the negative impact on the art market [after] the September 11, 2001 terrorist attacks. Applying these reductions, [the defendants' expert] determined that the total fair market value of the personal property transferred in the sale of assets was $693,496.50, making Steven['s] . . . one-half interest $346,748.25. [The defendants' expert] further testified that the nature of Steven['s] . . . circumstances created a 'forced sale,' driving the value of his one-half interest much lower."

The trial court concluded that "the plaintiffs have not met [their] heightened burden with respect to the sale of assets. Steven . . . needed to come up with a large sum of cash quickly to pay the amounts he agreed to pay as part of his sentencing agreement, including a restitution payment to the plaintiffs. In light of this motivation, and in light of the fact that the property interests he was selling were one-half interests in assets that were co-owned with [Nancy], the court finds that the agreed upon value of the assets sold by Steven . . . to [Nancy] was not unreasonable. . . . Given the testimony of the [defendants] regarding the circumstances of the transfer and the conflicting opinions of the experts regarding the value of the one-half interests in the assets, the court cannot find, by the clear, precise and unequivocal evidence necessary, that the conveyance was made without substantial consideration."

The plaintiffs contend that the evidence established conclusively that Steven transferred to Nancy $102,000 in cash, $77,000 in investment accounts, $514,700 in California real estate and the $74,417 net cash value of Steven's life insurance policy, totaling $768,117 and

making Steven's 50 percent interest $384,058.50.[19] In addition, Steven transferred to Nancy certain art, antiques and furnishings that the defendants' expert valued at $693,496.50, with Steven's 50 percent interest being worth $346,748.25.[20] The plaintiffs also contend that the value of Steven's interest in Lagunitas was $3,226,845.50. Thus, they claim, Steven's interest in the property that he transferred to Nancy totaled $3,957,652.25,[21] approximately eight times the $475,000 purchase price. Accordingly, they claim, the trial court's finding that $475,000 was a reasonable price for the items was clearly erroneous.

We disagree. First, we have concluded that the trial court's finding that Nancy was the sole owner of the Lagunitas shares was not clearly erroneous. It necessarily follows that the trial court properly declined to take the value of that property into account in determining whether the price paid by Nancy was reasonable. Sec-

---

[19] The defendants dispute that the evidence conclusively established that Steven transferred these assets to Nancy. We need not address that question, however, because, even if we assume the truth of the plaintiffs' claim, we conclude that the trial court reasonably could have found that the $475,000 purchase price was reasonable.

[20] The plaintiffs contend that this figure was based on a mathematical error. Specifically, they point out that the defendants' expert testified that the marketable cash value (fair market value less projected sales expenses) of the property was $1,559,560. The expert also opined that this amount should be discounted by 40 to 45 percent, depending on the nature of the item, to account for the downturn in the art market after the September 11, 2001 terrorist attacks. As the plaintiffs point out, however, $1,559,560 discounted by 45 percent is $857,758, not $693,496.50. The plaintiffs do not contend that they ever brought this error to the attention of the trial court. Accordingly, we conclude that this claim was waived.

We also note that the plaintiffs' expert testified that the value of these items was $3.4 million, with Steven's 50 percent interest being $1.7 million. The plaintiffs make no claim on appeal that the trial court was required to accept this valuation over the valuation of the defendants' expert.

[21] Although the amount stated in the plaintiffs' brief is $3,957,632.25, it appears that this is a mathematical error and that the correct sum is $3,957,652.25.

ond, the plaintiffs do not dispute that the trial court reasonably could have found that the marketable cash value of Steven's interest in the remaining property was $730,806.75. The purchase price of $475,000 represented approximately 65 percent of this amount. As we have indicated, the trial court concluded that, as the result of the constrained time frame for the sale of the items and Steven's personal circumstances, Steven could not have sold the items for full market value. The plaintiffs have provided no authority for the proposition that the trial court was unauthorized to consider these "forced sale" circumstances in determining whether there had been an exchange for reasonably equivalent value.[22] Similarly, they have provided no authority for the proposition that a forced sale discount of 35 percent is unreasonable per se. Accordingly, we reject this claim.

## II

We next address the plaintiffs' claim that the trial court improperly determined that they had not proved

---

[22] The plaintiffs rely on *BFP* v. *Resolution Trust Corp.*, 511 U.S. 531, 534, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994), in which the plaintiff claimed that, under the provisions of federal bankruptcy law, the " 'reasonably equivalent value' " of a foreclosed property could be no less than the property's fair market price or, at the minimum, a fixed percentage of that price. The United States Supreme Court recognized that, outside the foreclosure context, reasonably equivalent value as used in the Bankruptcy Code ordinarily means fair market value. Id., 545. The court concluded, however, that a conclusion that the phrase had that meaning in the foreclosure context would upset state foreclosure law and place the security of real estate ownership in jeopardy, and there was no evidence that Congress had any such intention. Id., 544–45. Accordingly, the court concluded that reasonably equivalent value could be the drastically reduced forced sale value in the foreclosure context, as long as the sale was not collusive and complied with state foreclosure law. Id., 545.

The United States Supreme Court did not suggest, however, as the plaintiffs in the present case appear to claim, that foreclosure is the *exclusive* context in which reasonably equivalent value can be the forced sale value, and the plaintiffs have cited no other authority for that proposition. Accordingly, even if we were to assume that the United States Supreme Court's construction of federal bankruptcy provisions sheds light on the meaning of our state fraudulent conveyance law, that court's decision in *BFP* would

the claims of statutory theft and conversion.[23] We conclude that we need not consider the merits of this claim because we conclude in part III of this opinion that the trial court properly determined that the claims were barred by the statute of limitations.[24]

### III

Finally, we turn to the plaintiffs' claims that the trial court improperly determined that their claims of statutory theft and conversion and for equitable relief against Nancy were time barred.[25] We disagree.

The following facts and procedural history are relevant to our resolution of this claim. In support of its conclusion that the plaintiffs' actions of statutory theft and conversion were time barred, the trial court stated that "Steven . . . was convicted of insurance fraud on July 20, 1999. The plaintiffs knew, or reasonably should have known, that they had a cause of action against Steven . . . for damages relating to their 1993 payment to him as of July 20, 1999, which is more than four years prior to the filing of this action. Indeed, the plain-

not compel the conclusion that the trial court in this case was precluded from considering Steven's particular circumstances in determining that a forced sale value was appropriate.

[23] The plaintiffs' claim on appeal appears to relate exclusively to the trial court's determination that the plaintiffs had failed to establish that *Nancy* committed statutory theft or conversion.

[24] The plaintiffs do not appear to acknowledge that the trial court's conclusion that they had failed to prove their claims of statutory theft and conversion was an *alternative* ground for rendering judgment for the defendants, in addition to its conclusion that the claims were time barred. To the extent that they suggest that the trial court did not conclude that their claims with respect to *all* of Nancy's conduct, including the 2001 sale of assets, were time barred, we reject any such claim. As we discuss in part III of this opinion, the trial court concluded that both the claims relating to Nancy's use and enjoyment of the insurance proceeds in the years following 1993, and the claims relating to her receipt of Steven's interest in the property transferred to her in 2001, were time barred.

[25] On appeal, the plaintiffs challenge the trial court's decision with respect to Nancy only.

tiffs already have a judgment against Steven . . . for $22 million based upon the insurance fraud. The court finds that insofar as the plaintiffs' statutory theft and conversion claims are based upon the plaintiffs' payment of the insurance proceeds in 1993, these claims are barred by the statute of limitations."

The trial court continued: "After hearing the testimony of all of the witnesses and reviewing the documentary evidence admitted at the trial, the court concludes that the latest date upon which the plaintiffs should have known that they had a civil cause of action for insurance fraud and any other claims arising from that fraud was the date of Steven['s] . . . conviction on the criminal charges resulting from the insurance fraud. . . . While the parties have focused on the timing of [Nancy's] awareness of her husband's guilt or that she may be in possession of stolen property, the operative date for purposes of the statute of limitations is the date when the *plaintiffs* knew or reasonably should have known that they had a cause of action against [Nancy] to recover stolen property in her possession. With respect to their conversion claim, the plaintiffs argue that their claim did not accrue prior to a demand. While a demand may be an essential element to establish a cause of action for conversion, the operative date for the commencement of the statute of limitations is not controlled by either the date of [Nancy's] knowledge that she may [have] possess[ed] stolen property or the date when the plaintiffs . . . [made] a demand. The plaintiffs cannot extend the statute of limitations indefinitely by failing to make a demand upon someone whom they have reason to believe possesses property that rightfully belongs to them. At the time of Steven's . . . conviction, the plaintiffs knew or easily could have found out that he was married, and that the [defendants] jointly owned substantial assets

that potentially were purchased with the insurance proceeds." (Emphasis in original.)

The trial court then stated: "The plaintiffs claim that much of the property at issue in this case did not come into [Nancy's] possession until 2001, so that the plaintiffs' claims of theft with respect to this property is not barred by the statute of limitations. This claim contradicts the plaintiffs' claim that they could trace assets from their receipt by Steven . . . into accounts in [Nancy's] name, and to the funds used for the purchase and construction of [the] Brambly Hedge Circle [property] and even to assets owned by [Nancy] at the time of the trial. The court finds that many of the assets that the plaintiffs seek to recoup from [Nancy] were possessed by Steven . . . or [Nancy] or both of them beginning in 1993, and their use of the funds was never hidden from the plaintiffs or anyone else. The fact that [Nancy] conducted transactions in 2001 or may continue even up to today to possess or control assets that may have been derived from the initial insurance fraud by Steven . . . does not toll the statute of limitations."

Finally, the trial court concluded that, because the plaintiffs' equitable claims of unjust enrichment and for an accounting and a constructive trust were based on the same factual allegations as the plaintiffs' claims of conversion and statutory theft, the equitable claims also were time barred. See *Dowling* v. *Finley Associates, Inc.*, 49 Conn. App. 330, 335, 714 A.2d 694 (1998) ("[w]here a party seeks equitable relief pursuant to a cause of action that also would allow that party to seek legal relief, concurrent legal and equitable jurisdiction exists, and the statute of limitations that would be applicable to bar the legal claim also applies to bar the equitable claim"), rev'd on other grounds, 248 Conn. 364, 727 A.2d 1245 (1999).

"The question of whether a party's claim is barred by the statute of limitations is a question of law, which

this court reviews de novo." *Smulewicz-Zucker* v. *Zucker*, 98 Conn. App. 419, 423, 909 A.2d 76 (2006), cert. denied, 281 Conn. 905, 916 A.2d 45 (2007); see also *Giulietti* v. *Giulietti*, supra, 65 Conn. App. 833. The parties in the present case do not dispute that the statute of limitations for claims of conversion and statutory theft is the three year period applicable to torts, set forth in General Statutes § 52-577. Section 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." "In construing our general tort statute of limitations . . . we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred." (Internal quotation marks omitted.) *Fichera* v. *Mine Hill Corp.*, 207 Conn. 204, 212, 541 A.2d 472 (1988). "The date of the act or omission complained of is the date when the . . . conduct of the defendant occurs . . . ." *Vilcinskas* v. *Sears, Roebuck & Co.*, 144 Conn. 170, 173, 127 A.2d 814 (1956); see also *Valentine* v. *LaBow*, 95 Conn. App. 436, 445 n.8, 897 A.2d 624 ("§ 52-577 is an occurrence statute and . . . its limitation period does not begin when the plaintiff first discovers an injury" [internal quotation marks omitted]), cert. denied, 280 Conn. 933, 909 A.2d 963 (2006).

The plaintiffs contend that, with respect to their claim of statutory theft, Nancy's wrongful conduct was her receipt, retention and disposition of the plaintiffs' property with knowledge that the property was stolen. See General Statutes § 52-564 ("[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages"); General Statutes § 53a-119 (8) ("[a] person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property know-

ing that it has probably been stolen or believing that it has probably been stolen, unless the property is received, retained or disposed of with purpose to restore it to the owner").[26] They further contend that: (1) the trial court failed to render a factual finding as to when Nancy knew that the property was stolen, an issue that was hotly contested at trial; and (2) Nancy did not receive much of the stolen property until 2001, when she filed an affidavit of ownership with the clerk of the United States District Court to obtain access to the bail money and received property from Steven during the sale of assets.[27] Accordingly, they contend, the statute could not have begun to run until 2001. Similarly, with respect to their claim of conversion, the plaintiffs claim that the statute began to run either: (1) when Nancy exercised dominion over the property in 2001, knowing that it was stolen from the plaintiffs; or (2) assuming that she was not previously aware that the property had been stolen, when the plaintiffs made demand for the property in 2003.[28] See *Coleman* v. *Francis*, 102 Conn. 612, 616–18, 129 A. 718 (1925).

With respect to the bail money, which had been raised by selling the shares in Lagunitas, we conclude that the

[26] "This court has held that statutory theft under § 52-564 is synonymous with [the crime of] larceny as defined in . . . § 53a-119." (Internal quotation marks omitted.) *Mystic Color Lab, Inc.* v. *Auctions Worldwide, LLC*, 284 Conn. 408, 418 n.14, 934 A.2d 227 (2007).

[27] The parties appear to assume that the trial court properly focused on the date that the plaintiffs knew or reasonably should have known that Nancy had received the property stolen from them in determining when the statute of limitations had begun to run. The plaintiffs contend that they could not have known that Nancy possessed the stolen property until September, 2001, after Steven was sentenced in the criminal action. The defendants counter that the plaintiffs should have known that Nancy possessed the stolen property at least by June, 1999, when Steven was convicted. As we have indicated, however, § 52-577 begins to run when the wrongful conduct occurs, not when the plaintiff discovers or should have discovered the conduct. Accordingly, we focus our inquiry on the date of the wrongful conduct.

[28] Presumably, the plaintiffs are contending that their complaint against Nancy constituted a demand for the stolen property.

record leaves no doubt that Nancy knew at least as early as July, 1999, when Steven was convicted, that Steven effectively had stolen the insurance proceeds.[29] Thus, to the extent that the money with which she had purchased the Lagunitas shares came from the insurance proceeds, she knew that it had been stolen in 1999. Accordingly, we conclude that the trial court properly determined that the statute of limitations for the allegations of statutory theft and conversion with respect to this property had expired when the plaintiffs brought the action in October, 2003.

With respect to the property that Nancy received from Steven in the sale of assets in 2001, the plaintiffs claim that this property could be traced to Steven's receipt of the insurance proceeds in 1993. The trial court found, however, that "many of the assets that the plaintiffs seek to recoup from [Nancy] were possessed by Steven . . . *or [Nancy] or both of them* beginning in 1993 . . . ."[30] (Emphasis added.) The plaintiffs have

---

[29] As we have indicated, the trial court focused on the date that the *plaintiffs* knew that Steven had stolen their property and found that "the latest date upon which the plaintiffs should have known that they had a civil cause of action for insurance fraud and any other claims arising from that fraud was the date of Steven['s] . . . conviction on the criminal charges resulting from the insurance fraud," i.e., July 20, 1999. It is implicit in this finding that Nancy also must have been aware that she was in possession of potentially stolen property on that date, if not earlier.

[30] The plaintiffs suggest that this finding was inconsistent with the trial court's rejection of their claims of statutory theft and conversion on the ground that it was "not convinced that the plaintiffs have proven their theft or conversion claims by the 'tracing' of the assets by the plaintiffs' expert forensic accountant from the disbursement of the insurance proceeds in 1993 to the date of the sale of assets and beyond." We disagree. It is clear that, in the years following 1993, when Steven fraudulently acquired $17.5 million belonging to the plaintiffs, the defendants were in possession of assets belonging to the plaintiffs. The trial court concluded, however, that, in order to prevail on the merits of their claims of statutory theft and conversion, the plaintiffs had to prove *which specific assets* currently belonging to the defendants could be traced to the insurance fraud, and the plaintiffs do not challenge this legal conclusion on appeal. Rather, they challenge the court's factual finding that they failed to meet this burden. With respect to the statute of limitations issue, the court concluded that,

not identified the specific assets in which they claim Nancy had no interest prior to the sale of assets in 2001. Nor have they explained why, with respect to the assets in which Nancy had an interest prior to 2001, the statute of limitations did not begin to run at the time that she received that interest and had knowledge that the assets could be traced to the insurance proceeds. Accordingly, we conclude that the trial court properly determined that the plaintiffs' statutory theft and conversion claims against Nancy were time barred. We further conclude that the trial court properly determined that, because these legal claims are barred, the plaintiffs' equitable claims based on the same facts also are time barred.

The judgments are affirmed.

In this opinion the other justices concurred.

to the extent that the defendants possessed assets belonging to the plaintiffs in 1993, the statute of limitations for conversion and statutory theft began to run as to Nancy when she learned that the assets had been stolen in 1999. To the extent that Nancy received assets in 2001, in which she previously had had no interest, the plaintiffs had failed to identify those assets.

The plaintiffs claim that, "[t]o the extent [that the] defendants intermingled assets, it was their burden to distinguish property untainted by Steven's crime from property secured from other sources." They have cited no authority for this proposition. The burden of proof in an action alleging statutory theft is on the plaintiff. See *Howard* v. *MacDonald*, 270 Conn. 111, 128, 851 A.2d 1142 (2004).