CONSTANCE J. JARVIS *v.* CONSTANCE M. LIEDER ET AL.
(AC 30457)

Bishop, DiPentima and Gruendel, Js.

Argued May 28—officially released September 15, 2009

*Noah J. Schafler*, for the appellants (defendants).

*Christine L. Curtiss*, for the appellee (plaintiff).

GRUENDEL, J. A constructive trust arises "when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership. . . . The specific instances in which equity impresses a constructive trust are numberless,—as numberless as the modes by which property may be obtained through bad faith and unconscientious acts." (Internal quotation marks omitted.) *Millard* v. *Green*, 94 Conn. 597, 601–602, 110 A. 177 (1920). This appeal calls on us to determine whether the trial court properly classified the defendants' actions as among those numberless instances of bad faith or unconscientious acts that warrant the imposition of a constructive trust.

The defendants, Constance M. Lieder, Carol A. Heffernan and Colleen M. Lieder, appeal from the judgment of the trial court, which imposed a constructive trust on assets titled in their name, naming the plaintiff, Constance J. Jarvis, as beneficiary. On appeal, the defendants contend that the court improperly (1) considered extrinsic evidence that contradicted the express terms of a deed, (2) rewarded the plaintiff despite the allegedly wrongful purpose of her activities, (3) found in favor of the plaintiff on a cause of action that was not pleaded in the amended complaint, (4) imposed a constructive trust on the basis of the existence of a confidential relationship and (5) applied the applicable statute of limitations and the doctrine of laches. We disagree and affirm the well reasoned judgment of the trial court.

To understand the complex family relationships involved in the present case, we begin with the dramatis personae. The plaintiff was one of six siblings. Heffernan and Constance Lieder are daughters of the plaintiff's sister, Stell. Colleen Lieder is Constance Lieder's

daughter and, thus, the plaintiff's grandniece. Also involved in the case, but only tangentially, are Ronald Ritchie, Kenneth Ritchie and Deborah Hyder, the children of the plaintiff's sister, Mary Ritchie. In addition, another grandniece, Jessica Hyder, is involved to the extent that the plaintiff assisted her in paying college tuition.

The following facts relevant to our disposition of the defendants' appeal are culled from the court's detailed and comprehensive memorandum of decision. On October 10, 1999, the plaintiff's husband of fifty-eight years, Charles Jarvis, died. "The plaintiff, who was then eighty-four years of age, was emotionally shaken. At the time of her husband's death, the plaintiff was in reasonably good health for her age but was legally blind. She could read only by using a magnifying glass and also was hard of hearing. Before Charles Jarvis' death, Colleen [Lieder] began discussing the plaintiff's finances with her and the eligibility requirements for long-term medical care under [title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (medicaid)],[1] should the plaintiff require such care in the future. The plaintiff desired to convey her home to Constance [Lieder], [Heffernan] and Ronald Ritchie. She discussed the proposal with the defendants and asked them which attorney she should employ to effectuate the conveyance. [Heffernan] recommended attorney Thomas Condon, who had prepared the will of the plaintiff's mother and sister. On December 13, 1999, Constance [Lieder], [Heffernan] and the plaintiff met with . . . Condon in his office. The subject of a life estate was discussed in the meeting, although there was no evidence as to what was said.

---

[1] "Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396s, commonly known as the Medicaid Act, is a federal-state cooperative program designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of medical care." (Internal quotation marks omitted.) *Sikand* v. *Wilson-Coker*, 276 Conn. 618, 620, 888 A.2d 74 (2006).

. . . Condon did not speak with the plaintiff outside the presence of her nieces, nor did he advise her that her home would be subject to the creditors of her nieces and nephew upon transfer. He prepared a quitclaim deed and, on December 13, 1999, the plaintiff conveyed her home . . . to Ronald Ritchie, [Constance Lieder and Heffernan] 'for the consideration of love and affection' . . . .

"At the time of the conveyance, the plaintiff understood that she would be able to live in the house until her death, at which time it would belong to her nieces and nephew. . . . Heffernan, too, testified that there was an understanding and an assumption that the plaintiff would continue to live in the house.

"After Charles Jarvis' death, Colleen [Lieder] became more than a grandniece who shared a warm familial relationship with the plaintiff. She became the plaintiff's trusted financial adviser. Colleen [Lieder] was an educated young woman and a corporate accountant. The plaintiff was elderly and unable to read without the aid of a magnifying glass.

"[On October 10, 1999] [w]hen [Charles] Jarvis died, he and the plaintiff had approximately $154,577 in three bank accounts . . . ." There were two savings accounts, one with a balance of $84,056 and one with $49,349, and a checking account with a balance of $21,172. "On November 15, 1999, the two savings accounts were closed. The proceeds of the smaller . . . account . . . were deposited into a joint checking account opened . . . in the names of the plaintiff and Colleen [Lieder]. This account was referred to at trial as the 'small' checking account [small checking account]. Colleen [Lieder] has acknowledged that her name was placed on this account for purposes of convenience, to enable her to sign checks for the plaintiff's bills. The defendants make no claim of ownership as to this

account. The proceeds of the larger savings account owned by the plaintiff and her late husband were placed in an annuity opened by the plaintiff. Constance [Lieder] and [Heffernan] were named as beneficiaries of the annuity.

"On March 3, 2000, the joint checking account owned by the plaintiff and her late husband was closed . . . the balance having increased after [Charles] Jarvis' death as a result of various deposits, including life insurance proceeds. On March 15, 2000, the closing proceeds from this account were deposited into the joint checking account in the names of the plaintiff and Colleen [Lieder]. On September 30, 2000, a certificate of deposit . . . was opened in the names of all three defendants [and the plaintiff was not listed on the account]. The certificate of deposit was funded with a $55,000 check *signed by Colleen* [*Lieder*] and drawn on the small checking account.

"In December, 2000, a . . . checking account was opened . . . in the names of all three defendants [and again, the plaintiff was not listed on the account]. This account, referred to as the 'large' account [large account], was initially funded with a $5000 check signed by Colleen [Lieder] and drawn on the small checking account. On January 22, 2001, Colleen [Lieder] wrote an additional check in the amount of $15,000 drawn on the small [checking] account and deposited the check into the large account." (Emphasis in original.)

To summarize, as of December, 2000, the plaintiff had transferred title in her house to Heffernan, Constance Lieder and Ronald Ritchie. An annuity, with Constance Lieder and Heffernan as beneficiaries, had been opened using the plaintiff's funds. Of the approximately $80,800 in funds remaining, $55,000 had been used to open a certificate of deposit in the names of all three defendants and $20,000 had been used to fund the large

account in the names of all three defendants. This left the plaintiff with less than $6000 remaining from the proceeds of the original three accounts she held with her late husband.

"Thereafter, the small checking account functioned as a repository [for] the plaintiff's social security checks and the survivorship benefits she received from her late husband's pension. The balance in the small checking account was kept at or about . . . $5000. Whenever the balance of the small [checking] account increased significantly above that amount, Colleen [Lieder] withdrew sums of money from [that] account and deposited the sums into the large account. Between March, 2001, and June, 2006, there were approximately three dozen withdrawals from the small [checking] account and corresponding deposits into the large account, generally ranging from $1800 to $5000. The total amount transferred . . . exceeded $130,000. The monthly statement for the small account (held by the plaintiff and Colleen [Lieder] jointly) was sent to the plaintiff's home. The statement for the large account . . . was sent to Colleen [Lieder].

"Twice a month, Colleen [Lieder] visited the plaintiff at her home and reviewed her bills . . . . The plaintiff had to use her magnifying glass to examine the bills. Colleen [Lieder] wrote out and signed checks paying the bills. All bills were paid out of the large checking account held jointly by the defendants. Occasionally, Colleen [Lieder] would bring over the monthly statement for [that] account. As early as 2000 or 2001, the plaintiff saw, but did not question, that this account was in the names of the defendants. Colleen [Lieder] also provided the plaintiff with a monthly stipend of $850 out of this account.

"In May, 2001, Constance [Lieder] called Ronald Ritchie and told him that the plaintiff wanted him to convey

his one-third interest in [the plaintiff's home] back to her. On May 15, 2001, Ronald Ritchie dutifully went to attorney Condon's office, where a quitclaim deed already had been prepared. He executed the deed and later informed the plaintiff that he had done so. On June 7, 2001, the plaintiff quitclaimed half of her one-third interest in the home [back] to Ronald Ritchie and half to Colleen Lieder 'for the consideration of love and affection . . . .'

"In 2005, the plaintiff asked Colleen [Lieder] for an increase in her $850 [monthly] allowance to pay various incidental expenses. Colleen [Lieder] refused to increase the allowance. [Also] [i]n 2005, Jessica Hyder entered college. When a tuition payment was due, [her] mother would inform the plaintiff, and the plaintiff would tell Colleen [Lieder]. [The latter] then had a check drawn . . . in the amount of $2500 on the large account held jointly by the defendants and made payable to Eastern Connecticut State University. Three such checks were drawn [between July, 2005, and June, 2006]. Colleen [Lieder] prepared and had Jessica [Hyder] sign a memo, witnessed by the plaintiff, stating that the check was an advance [of], and would be deducted from, her [expected] inheritance [from the plaintiff]. The memo accompanying the [July, 2005] tuition check was also witnessed by each of the defendants and Ronald Ritchie. The memo accompanying the [June, 2006] tuition check was witnessed by the defendants.

"In December, 2005, Ronald Ritchie took the plaintiff to a bank, where she removed . . . [Heffernan] and Constance [Lieder] as beneficiaries of her annuity and named ten other relatives . . . in their stead for varying amounts. Kenneth Ritchie and Ronald Ritchie were each beneficiaries of 31.5 percent of the annuity, and Deborah Hyder was named beneficiary for 10 percent of the annuity. The plaintiff's [other] nephews . . . were

beneficiaries for amounts ranging from 1 percent to 10 percent of the annuity. The plaintiff reserved 0.5 percent for St. Anthony's Church.

"In March, 2006, Constance [Lieder's] mother-in-law had triple bypass heart surgery. Constance [Lieder] had to provide postoperative home care for her. During that same time period, Constance Lieder's sister-in-law became terminally ill and died on May 4, 2006. Also in March, 2006, [Heffernan's] daughter lost her baby-sitter in a motor vehicle accident, requiring [Heffernan] to provide child care for her granddaughter . . . . As a result of these events, both Constance [Lieder] and [Heffernan] suspended their visits to the plaintiff.

"On May 4, 2006, the plaintiff was hospitalized for a rapid heartbeat. The defendants did not visit the plaintiff in the hospital, nor when she returned home. Indeed, they were unaware of her cardiac incident for some time. On June 28, 2006, the plaintiff, the defendants, Ronald Ritchie, Kenneth Ritchie, Jessica Hyder and [her father] David Hyder met at the plaintiff's home. The purpose of the meeting was to give Jessica [Hyder] another $2500 tuition check." At that meeting, Jessica Hyder executed a writing indicating that she received $2500 from the plaintiff, which would be deducted from any inheritance she eventually received from the plaintiff. "The document was signed by Jessica [Hyder], as well as by the plaintiff, [Heffernan] and Colleen [Lieder]. Jessica [Hyder] received her check. Kenneth Ritchie stated that the plaintiff wanted the defendants to return the education funds to her. The defendants refused. The plaintiff sat silent during this heated discussion. When an altercation ensued, Jessica [Hyder] left with her father.

"Soon thereafter, the plaintiff, with the assistance of Ronald Ritchie . . . had her telephone number changed. In August, 2006, a meeting was held between

the plaintiff and the defendants. The plaintiff was represented by attorney Dominick Thomas; the defendants were represented by attorney Kevin Condon, the son of attorney Thomas Condon. At this meeting . . . Thomas demanded that the defendants return to the plaintiff all funds and property conveyed to them that had belonged to the plaintiff. The defendants refused.

"The plaintiff commenced this action . . . on September 21, 2006. Subsequently, the defendants authorized their attorney to serve the plaintiff with a notice to quit the premises [at her home]. [Although the plaintiff was informed that there was a possibility of being evicted], the defendants never pursued an action to evict the plaintiff.

"In October, 2006, the defendants withdrew $10,000 from the large checking account and used the moneys to pay their attorney. In May, 2007, they transferred $20,000 from the certificate of deposit to the large account and withdrew another $10,000 from the large account in August, 2007, to pay additional moneys to their attorney."

The plaintiff's amended complaint contains three counts. The first alleges that the defendants violated the trust and confidence placed in them by the plaintiff and that they were unjustly enriched to the plaintiff's detriment. The second count alleges unlawful conversion. The third count alleges that the defendants committed statutory theft pursuant to General Statutes § 52-564.[2] The court ruled in favor of the plaintiff on the first two counts, finding that the defendants were unjustly enriched and that they unlawfully converted the property of the plaintiff. By way of remedy, it imposed a constructive trust, ordering the defendants to convey

---

[2] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

to the plaintiff a life estate in her home and the proceeds of the certificate of deposit and bank accounts. The court also awarded the plaintiff damages in the amount of $20,000 plus interest. With regard to the third count, the court determined that the plaintiff had not sustained her burden and that the defendants did not commit statutory theft.

The defendants present several claims on appeal. First, they assert that the court improperly construed the first count of the amended complaint as a contract claim. They then advance the theory that the court should not have found in favor of the plaintiff in light of the allegedly illegal purpose of the transfers to the defendants. They next contend that the court improperly considered evidence of the plaintiff's intent regarding the conveyance of her home that contradicts the express terms of the deed. With regard to the imposition of a constructive trust, the defendants claim that the court improperly found that they had a confidential and fiduciary relationship with the plaintiff. Finally, the defendants claim that the court improperly ruled on their special defenses—that the plaintiff's action was barred by the statute of limitations and the doctrine of laches. We address each of these in turn.

I

CONSTRUCTION OF THE COMPLAINT

We begin by addressing the claims that may be disposed of in short order. The defendants first assert that the court improperly interpreted the first count of the plaintiff's complaint as stating a cause of action for breach of contract. The premise of this claim is faulty in that the court did not determine that the plaintiff pleaded a cause of action for breach of contract, and, thus, it cannot have done so improperly. Count one of the complaint states in relevant part: "[T]he defendants have violated the trust and confidence placed in them

by the plaintiff and have been unjustly enriched to the detriment of the plaintiff." Although the court's memorandum of decision does suggest that the defendants breached an agreement with the plaintiff, the court's ultimate finding with regard to count one is that the defendants were unjustly enriched at the expense of the plaintiff—just as pleaded in the complaint. Thus, the defendants' first claim is without merit.

## II

## ILLEGALITY OF PURPOSE

The defendants also claim that the court improperly ruled in favor of the plaintiff despite the fact that the transfer of assets to the defendants was done for an illegal purpose. The defendants assert, and the court found, that the plaintiff transferred her house and money to the defendants, at least in part, for the purpose of qualifying for medicaid benefits.[3] The defendants argue that this is an illegal purpose from which the plaintiff should not be entitled to benefit.

Having reviewed the record, it does not appear that the defendants advanced any argument in the trial court regarding illegality of purpose. Although witnesses were questioned about the plaintiff's intentions with regard to medicaid during the trial, the defendants never set forth any argument in the trial court that they should prevail because of those intentions. Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." Indeed, "it is the appellant's responsibility to present such a

---

[3] The court found that the plaintiff had several purposes in transferring her assets to the defendants other than to qualify for medicaid. For example, it found that she also "sought to reward the grantees for their love, affection and care . . . ."

claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. That is the basis for the requirement that ordinarily [the appellant] must raise in the trial court the issues that he intends to raise on appeal. . . . For us [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in an trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Sturgeon* v. *Sturgeon*, 114 Conn. App. 682, 693, 971 A.2d 691, cert. denied, 293 Conn. 903, 975 A.2d 1278 (2009). Thus, we will not address the defendants' claim regarding illegality of purpose absent an affirmative request to notice plain error or for review pursuant to the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[4] See *South Windsor Cemetery Assn., Inc.* v. *Lindquist*, 114 Conn. App. 540, 553–54, 970 A.2d 760 (2009).

### III

### PAROL EVIDENCE

We next address whether the court improperly considered and credited evidence contradicting the express terms of the deed transferring title in the plaintiff's home to the defendants. The court considered evidence that the parties intended for the plaintiff to retain some interest in her home despite the express terms of the deed, which is absolute on its face. As a general rule, parol evidence may not be used to contradict the unambiguous terms of a deed purporting to convey title to real property. See *Schmaling* v. *Schmaling*, 48 Conn.

[4] Our refusal to address the merits of the defendants' claim should not be taken to imply that the plaintiff's action could be defeated if an illegality of purpose were found. We note that the doctrine whereby a claim may be defeated by demonstrating illegality relating to the purpose of the underlying transaction applies only to breach of contract actions. See 2 Restatement (Second), Contracts § 179 (1981). As discussed previously, the court did not find breach of contract but, rather, unjust enrichment. Cf. id., § 199 (restitution may be available despite contract for improper purpose).

App. 1, 18, 707 A.2d 339, cert. denied, 244 Conn. 929, 711 A.2d 727 (1998); see also *Apostles of the Sacred Heart* v. *Curott*, 187 Conn. 591, 595, 448 A.2d 157 (1982).

"There are situations, however, where equity, in order to work out justice between the parties, will itself raise a trust . . . and such trusts do not fall within the rule stated above. . . . Within this category fall constructive trusts . . . . [W]e have said that the basis of such trusts may be found in fraud, misrepresentation, imposition, circumvention, artifice or concealment, or abuse of confidential relations." (Citations omitted; internal quotation marks omitted.) *Worobey* v. *Sibieth*, 136 Conn. 352, 355–56, 71 A.2d 80 (1949); accord 1 Restatement (Third), Trusts § 24, comment (f), pp. 353–54 (2003). Exceptions to the general rule prohibiting the consideration of parol evidence to contradict the terms of a deed "have been recognized where an injustice, sufficient to raise an equitable trust, would otherwise result. . . . In such cases, a trust does not arise so much by reason of the parol agreement of the parties but by operation of law." (Citation omitted.) *Cohen* v. *Cohen*, 182 Conn. 193, 202, 438 A.2d 55 (1980). Thus, in light of the foregoing precedent, the court did not improperly consider parol evidence in determining whether to impose a constructive trust on the premises that is the subject of the deed at issue.

IV

CONFIDENTIAL RELATIONSHIP

We next turn to the defendants' claim that the court improperly found that a confidential relationship existed between the parties and that the defendants thus owed a fiduciary duty to the plaintiff. They further claim that absent such a confidential and fiduciary relationship, or fraud or misrepresentation, the court was

not justified in imposing a constructive trust.[5] We begin our analysis of this claim by setting forth our standard of review. "A court's determination of whether to impose a constructive trust must stand unless it is clearly erroneous or involves an abuse of discretion. . . . This limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Menard* v. *Gaskell*, 92 Conn. App. 551, 555, 885 A.2d 1254 (2005). Furthermore, "[w]hether . . . a confidential relationship exists is a factual question for the trial court [and] our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Albuquerque* v. *Albuquerque*, 42 Conn. App. 284, 287, 679 A.2d 962 (1996).

"In *Beatty* v. *Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378 (1919), Judge Cardozo wrote: A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a [trustee

---

[5] The defendants also claim that a constructive trust could not be imposed because the court lacked an evidentiary basis to conclude that they agreed to hold the property at issue for the benefit of the plaintiff while she was alive. This claim challenges the court's findings of fact, which we may reverse only if they are shown to be clearly erroneous. See Practice Book § 60-5. Having reviewed the record, we cannot say that it was clearly erroneous for the court to have found a promise and an intention to use the property conveyed to the defendants for the benefit, support and maintenance of the plaintiff during her life.

. . . .] The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment. . . . Thus, a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." (Citations omitted; internal quotation marks omitted.) *Cohen* v. *Cohen,* supra, 182 Conn. 202–203.

As discussed previously, to impose a constructive trust, the court must find the existence of "fraud, misrepresentation, imposition, circumvention, artifice or concealment, or abuse of confidential relations." (Internal quotation marks omitted.) *Worobey* v. *Sibieth,* supra, 136 Conn. 356; accord *Garrigus* v. *Viarengo,* 112 Conn. App. 655, 672, 963 A.2d 1065 (2009). In the present case, the court based its imposition of a constructive trust on the finding that a confidential relationship existed between the defendants and the plaintiff. "A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." (Internal quotation marks omitted.) *Albuquerque* v. *Albuquerque,* supra, 42 Conn. App. 287.

We note that the defendants do not contest any conclusions of law with regard to the confidential relationship. They do not argue that even if such a relationship existed, they did not abuse the relationship or breach their duties to the plaintiff, nor do they claim that the court improperly concluded that they were unjustly enriched to the detriment of the plaintiff. Rather, the defendants contest only the finding that such a relation-

ship existed between Constance Lieder and Heffernan on the one hand and the plaintiff on the other.[6]

The court had ample evidence from which it could determine that a confidential relationship existed. It heard and credited testimony from the plaintiff and Heffernan that "the plaintiff, who was childless, considered her nieces and nephews, especially [Heffernan] and Constance [Lieder], as her children." Cf. *Cohen* v. *Cohen*, supra, 182 Conn. 203 ("[w]hile the relationship between parent and child is not per se a fiduciary one, it does generate a natural inclination to repose great confidence and trust" [internal quotation marks omitted]). The court also found, on the basis of significant evidence in the record, that "[Heffernan] and Constance [Lieder] provided companionship to the plaintiff, assisted her with errands, brought her to medical appointments and funerals, purchased household items for her, attended to her when she was infirm, helped her maintain her home and threw her birthday parties." These are all further indications of a confidential relationship. Additionally, the court heard evidence from which it reasonably concluded that the Constance Lieder and Heffernan "steered the plaintiff to the attorney of their choice" for the purpose of transferring the plaintiff's home to them. Furthermore, the court heard and credited evidence that the plaintiff was elderly and legally blind; see General Statutes § 10-294a; and relied on the defendants to help her meet the demands of daily life. This further indicates the existence of a confidential relationship. See *Berty* v. *Gorelick*, 59 Conn.

---

[6] The defendants do not argue that Colleen Lieder did not have a confidential relationship with or fiduciary duty to the plaintiff. There was extensive evidence from which the court could conclude that she had a confidential relationship with the plaintiff. Colleen Lieder was the plaintiff's trusted financial adviser and had control of the plaintiff's accounts and finances. Cf. *Berkowitz* v. *Berkowitz*, 147 Conn. 474, 477, 162 A.2d 709 (1960) (donee in position of "religious, professional or business adviser, or a position closely analogous thereto" must demonstrate no abuse of fiduciary relationship).

App. 62, 69, 756 A.2d 856 (court considered "advanced age, physical and mental condition" as factors in determining existence of confidential, fiduciary relationship), cert. denied, 254 Conn. 933, 761 A.2d 751 (2000).

The evidence demonstrates that the plaintiff was elderly and disabled, and that the defendants had significant control and influence over her financial and personal affairs. See id. Thus, the court's conclusion that a confidential, fiduciary relationship existed was not clearly erroneous, nor was the imposition of a constructive trust an abuse of discretion.

V

STATUTE OF LIMITATIONS AND LACHES

Finally, we turn to the defendants' claim that the court improperly ruled on their special defenses, asserting that the plaintiff's action is barred by the statute of limitations, General Statutes § 52-577, and the equitable doctrine of laches.

A

"The question of whether a party's claim is barred by the statute of limitations is a question of law, which this court reviews de novo." (Internal quotation marks omitted.) *Certain Underwriters at Lloyd's, London* v. *Cooperman*, 289 Conn. 383, 407–408, 957 A.2d 836 (2008). The factual findings that underpin that question of law, however, will not be disturbed unless shown to be clearly erroneous. Cf. *Emigrant Mortgage Co.* v. *D'Agostino*, 94 Conn. App. 793, 803–804, 896 A.2d 814, cert. denied, 278 Conn. 919, 901 A.2d 43 (2006).

Section 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." The parties do not dispute that the second count of the plaintiff's

complaint sounding in conversion is limited by that statute. See *Certain Underwriters at Lloyd's, London* v. *Cooperman*, supra, 289 Conn. 408. Rather, the defendants simply assert that the court improperly applied the statute and the continuing course of conduct tolling doctrine.

In construing § 52-577, our Supreme Court has concluded that the three year period begins on the date that the "act or omission complained of" occurs, not the date that the cause of action accrues or the date that the injury occurs. Id. Thus, we must determine when the wrongful acts occurred. "There are two general classes into which conversions are grouped: (1) those where the possession is originally wrongful, and (2) those where it is rightful. . . . The second class comprises those where the possession, originally rightful, becomes wrongful by a wrongful detention." (Internal quotation marks omitted.) *Horelik* v. *Roth*, 15 Conn. App. 649, 654, 545 A.2d 1167, cert. denied, 209 Conn. 819, 551 A.2d 756 (1988).

The court found conversion of the certificate of deposit and the large account, and we address § 52-577 as it applies to each. First, the court found, as a factual matter, that "the plaintiff either authorized the creation of [the large account] or acquiesced in its creation in the defendants' names soon after it was established." In light of that fact, the court properly concluded that the initial possession of the funds was not originally wrongful but became wrongful by a wrongful detention. That detention occurred in August, 2006, "when [the defendants] refused to turn it over to the plaintiff in the meeting that included the parties' attorneys." The present action was filed approximately one month later, well within the three year limitations period.

Conversely, the court found that the certificate of deposit was within the first class of conversion in that

the possession of the funds was wrongful from the outset. The court reasoned that the funds used to open the certificate of deposit were appropriated without the plaintiff's knowledge and that the conversion occurred at the time of that appropriation. We agree, and because the certificate of deposit was opened on September 30, 2000, six years before this action was filed, the conversion of the certificate of deposit was outside of the three year limitations period.

That does not end the analysis, however, because the court found that the statute of limitations was tolled under the continuing course of conduct doctrine. "The issue . . . of whether a party engaged in a continuing course of conduct that tolled the running of the statute of limitations is a mixed question of law and fact. . . . We defer to the trial court's findings of fact unless they are clearly erroneous. . . . [I]n order [t]o support a finding of a continuous course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to the commencement of the period allowed for bringing an action for such a wrong. . . . Where [our Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . The continuing course of conduct doctrine is conspicuously fact-bound." (Citations omitted; internal quotation marks omitted.) *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 833–34, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001).

In the present case, the court found both a special relationship giving rise to a continuing duty and later wrongful conduct by the defendants. The topic of the

special relationship is exhausted in part IV and, thus, requires no analysis here. The court found that in light of their confidential relationship with and fiduciary duty to the plaintiff, the defendants had an obligation to inform her of their actions with regard to her assets and that they did not do so throughout the time that they were in control of those assets. This, the court concluded, was later wrongful conduct sufficient to toll the applicability of § 52-577. That finding is not clearly erroneous and must therefore stand.

B

We next address the defendants' claim that the plaintiff's causes of action seeking equitable relief were barred by the doctrine of laches. "The standard of review that governs appellate claims with respect to the law of laches is well established. A conclusion that a plaintiff has been guilty of laches is one of fact for the trier and not one that can be made by this court, unless the subordinate facts found make such a conclusion inevitable as a matter of law. . . . We must defer to the court's findings of fact unless they are clearly erroneous. . . .

"The defense of laches, if proven, bars a plaintiff from seeking equitable relief . . . . First, there must have been a delay that was inexcusable, and, second, that delay must have prejudiced the defendant. . . . The burden is on the party alleging laches to establish that defense. . . . The mere lapse of time does not constitute laches . . . unless it results in prejudice to the [opposing party] . . . as where, for example, the [opposing party] is led to change his position with respect to the matter in question." (Citations omitted; internal quotation marks omitted.) *Caminis* v. *Troy*, 112 Conn. App. 546, 552, 963 A.2d 701, cert. granted on other grounds, 291 Conn. 909, 969 A.2d 171 (2009).

In the present case, the court found that the defendants did not present facts sufficient to establish either element of laches. It noted that "[t]his action was brought the same year [that] the plaintiff learned that the defendants denied she had any interest in . . . [the] asset[s]." Just as with its findings regarding the statute of limitations, this finding is not clearly erroneous and must, therefore, stand.

The judgment is affirmed.

In this opinion the other judges concurred.