# DUBALDO ELECTRIC, LLC *v.* MONTAGNO CONSTRUCTION, INC., ET AL.
## (AC 30063)

Gruendel, Harper and Schaller, Js.

Argued October 16, 2009—officially released February 23, 2010

*Robert J. O'Brien*, for the appellants-appellees (named defendant et al.).

*Wayne Christopher Gerlt*, for the appellee-appellant (plaintiff).

*Opinion*

GRUENDEL, J. The defendants, Montagno Construction, Inc. (Montagno), and Hanover Insurance Company (Hanover),[1] appeal from the judgment rendered after a court trial, in favor of the plaintiff, DuBaldo Electric, LLC (DuBaldo). The defendants challenge as clearly erroneous the trial court's findings that (1) DuBaldo substantially performed its contractual obligations, (2) DuBaldo was entitled to $193,120.80 in damages, (3) DuBaldo suffered a 20 percent loss of efficiency and (4) judgment be rendered against Hanover. Additionally, DuBaldo cross appeals, contending that the court erred in denying its recovery for attorney's fees. We affirm the judgment of the trial court.

In its February 11, 2008 memorandum of decision, the court found the following facts. Burlington Coat Factory hired Montagno as the general contractor to renovate space that it leased in the Brass Mill Center Mall in Waterbury. Seeking to become the electrical subcontractor for that project, DuBaldo submitted to Montagno a bid of $243,600 and estimated that the job would take 3200 man hours to complete.[2] On June 21, 2004, DuBaldo received a letter from Montagno awarding it the electrical subcontract work for $250,450,

---

[1] GGP Brass Mill, Inc., and Burlington Coat Factory were named as defendants but are not involved in this appeal. We therefore refer to Montagno and Hanover as the defendants.

[2] Initially, DuBaldo estimated that it would take 3600 man hours to complete the job. In subsequent conversations with Burlington Coat Factory, DuBaldo reduced that amount to 3200 man hours.

which it signed and returned on June 25, 2004, and which Montagno received on July 1, 2004. Attached to that letter was a scope of work plan. That letter represented the contract between the parties.[3]

On June 28, 2004, DuBaldo applied for an electrical permit with the city of Waterbury. Issuance of the permit was delayed until July 14 as a result of deficiencies in Burlington Coat Factory's architectural design and understaffing at the Waterbury electrical inspector's office. Several times, Montagno communicated to Burlington Coat Factory the importance of obtaining certain architectural information necessary for the issuance of the permit. Those communications were without success. "The court [found] that DuBaldo properly attempted to secure the electrical permit . . . but was unable to do so for reasons beyond its control and within the control of the defendants. While on July 1 . . . Montagno distributed a project time line, setting forth ten five day weeks, from . . . June 21 through . . . August 27 for the electrical work, Montagno failed to update that time line when, for the first two weeks of July, the electrical work was stalled by [the permit's delay]."

Unable to perform electrical work without a permit, DuBaldo fell approximately three weeks behind schedule. On August 14, to make up for time lost, Montagno authorized an acceleration in schedule in which DuBaldo agreed to work seven days a week with overtime. Burlington Coat Factory agreed to pay the overtime hours under that accelerated schedule. On August

[3] In mid-August, Montagno sent DuBaldo "two (2) copies of [their] subcontract agreement covering the Burlington Coat Factory . . . project." (Internal quotation marks omitted.) DuBaldo refused to sign that alleged contract. The court found that "the parties' actions post the signing of [the June 25] documents evidence[d] their intention to contract with each other at this time, with [the June 25] documents." That finding was made despite language in the June 25 contract indicating that "[a] formal contract will be forwarded to [DuBaldo] with[in] [thirty] days . . . ." (Internal quotation marks omitted.)

30, Montagno hired Globe Electric, LLC (Globe), to work alongside DuBaldo. Montagno informed DuBaldo that Globe had been hired to add electricians to the job. DuBaldo believed from its communications with Montagno that Globe's primary purpose was to address fire alarm deficiencies in Burlington Coat Factory's plans and, secondarily, to supplement DuBaldo on the original project. Globe joined the project pursuant to an oral agreement in which there was "no limit on hours to be worked, no bid, no limit on numbers of workers on the project and an hourly rate of $65 plus an addition of halftime with no cap on overtime hours billed."[4] Although Montagno deducted from DuBaldo's account the amount that it paid Globe for work performed within the scope of DuBaldo's contract, it never discussed with DuBaldo either the amount or mode of payment that Globe was to receive for its work.[5]

Despite Montagno's arrangement with Globe, Globe's work was subject to no oversight by Montagno. Indeed, Globe performed much of its work in the evening and on weekends when Montagno personnel was not present. Even more troubling, the bills that Globe submitted to Montagno did not detail what particular work Globe performed within the scope of DuBaldo's contract. Unlike DuBaldo, "Globe was timely paid in full, based

[4] The court found that "[Burlington Coat Factory] and Globe had historically enjoyed a close working relationship on prior and current projects and, unconcerned as to the conflict of interest, it was the position of Kurt Montagno, Montagno's principal, that '[he] trusted Globe to split the charges fairly between finishing DuBaldo's job, straight time and [Burlington Coat Factory's] change orders. . . . [He] was not concerned that Globe bulk billed with no backup and with no quotes for the jobs.' "

[5] DuBaldo hired electricians from Evolution Electric (Evolution), another electrical contracting company, to work on the project. DuBaldo paid Evolution's electricians between $35 and $45 per hour, as compared to Globe's rate of $65 per hour. Robert DuBaldo, DuBaldo's principal, testified that had he known about Globe's rate, he would instead have continued to employ Evolution's electricians.

upon a list of first names and hours worked . . . ."[6] Additionally, Globe's chief executive officer, Lawrence Marotti, was on vacation in Cancun, Mexico, and unable to oversee crucial electrical work being performed and billed. Remarkably, Montagno did not attempt to check whether Globe's work related to the original contract between Montagno and DuBaldo or to work performed outside of Montagno's contract with DuBaldo. Essentially, "Globe not only had free rein to bill unreviewed manpower and hours on this project, Globe also was the final arbiter of what bills were backcharged to DuBaldo . . . ."

In September, 2004, the relationship between DuBaldo's foreman, John Monaco, and Montagno's site superintendent, Richard Barzda, began to deteriorate. That negative interpersonal relationship resulted in the events culminating in DuBaldo's termination from the project. On September 27, 2004, DuBaldo intentionally disabled the fire alarm system one day before the city of Waterbury's scheduled inspection for the issuance of a temporary certificate of occupancy (certificate) for the upper level of the store. The court found that "[u]pon discovering [that] the fire alarm [was disabled], Globe was called in by Montagno, and . . . within a few hours got the fire alarm system back up and running, and the [certificate] inspection proceeded successfully and as scheduled." On September 28, 2004, the same day as the inspection, Montagno terminated DuBaldo via letter, citing as grounds for termination both the fire alarm incident and insufficient manning of the job. Thereafter, Globe completed DuBaldo's contractual obligations for which it was timely and fully compensated in the amount of $322,472. DuBaldo submitted change orders for costs of several jobs done outside the scope of its contract, and, at the time of

---

[6] Even as late as August 11, 2004, DuBaldo had yet to be paid by Montagno for work that it had performed according to the terms of its June 25 contract.

trial, all agreed that between July 16 and September 28, 2004, DuBaldo performed $105,867 of work over and above the contract price of $250,450. DuBaldo was partially compensated by Montagno for contractual work prior to its termination but was not compensated for any approved change order work.

In its February 11, 2008 memorandum of decision, the court found that Montagno was in breach of contract for terminating DuBaldo and that DuBaldo had substantially performed its contractual obligations as of September 28, 2004, when it was precluded from continuing work. The court further found that Burlington Coat Factory's unreasonably early fixturing and merchandising of the upper level of the premises caused DuBaldo a 20 percent loss of efficiency. The court awarded DuBaldo damages totaling $145,535.30. In its June 6, 2008 memorandum of decision, the court modified that amount to $193,120.80, after determining that it had miscalculated the initial amount, and denied DuBaldo's requests for both attorney's fees and prejudgment interest. This appeal followed.

I

The defendants raise a multitude of claims concerning the court's finding that DuBaldo had substantially performed its contractual obligations prior to termination.

"The determination of [w]hether a building contract has been substantially performed is ordinarily a question of fact for the trier to determine. . . . We have long held that a finding of fact is reversed only when it is clearly erroneous. A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial

court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *Pisani Construction, Inc.* v. *Krueger*, 68 Conn. App. 361, 364, 791 A.2d 634 (2002). Moreover, "[t]he analysis necessarily involves an inquiry into the totality of facts and circumstances surrounding the performance of the contract." *Miller* v. *Bourgoin*, 28 Conn. App. 491, 496, 613 A.2d 292, cert. denied, 223 Conn. 927, 614 A.2d 825 (1992).

## A

The defendants argue that the court's finding that DuBaldo had substantially performed its contractual obligations was clearly erroneous because there allegedly was no evidence before the court as to how many days might reasonably have been expected for the electrical permit to be issued. The defendants contend that the absence of such evidence is particularly significant in light of the court's reliance on the permit's delay as causing DuBaldo to fall behind schedule. We disagree.

Based upon our examination of the record, we conclude that the court had before it ample evidence to support its finding that the electrical permit's delay caused DuBaldo to fall behind schedule.[7] Although the defendants contend that the absence of any evidence as to how many days might reasonably have been expected for the permit to be issued rendered the court's finding clearly erroneous, Montagno identified the lack of a permit as a problem just three days after

[7] We acknowledge the defendants' claim that they are not to blame for the permit's delay because certain evidence allegedly indicates as much. The defendants, however, overlook significant evidence supporting the court's finding that the permit's delay was not the fault of DuBaldo and was within the control of the defendants. Essentially, the defendants invite us to retry the facts of the case. We refuse. See *Malmberg* v. *Lopez*, 208 Conn. 675, 679, 546 A.2d 264 (1988) (appellate court cannot retry facts of case).

DuBaldo had applied for it, on July 1, 2004, at the subcontract start-up meeting. At trial, Kurt Montagno, Montagno's principal, testified that "[h]e knew when [DuBaldo] didn't have a permit at the [project's] start . . . that there was going to be a schedule issue [be]cause the work just was not being hit full force. So, [he] got concerned right out of the box, basically, that there was going to be an issue." In an effort to remedy that scheduling issue, from July 2 through July 9, Kurt Montagno made several attempts to obtain architectural information from Burlington Coat Factory, which he understood as being crucial to the permit's issuance. In addition to Kurt Montagno's concerns, DuBaldo estimated that it would take approximately ten weeks to complete its electrical subcontract work and obtained the permit sixteen days after applying for it. It is undisputed that DuBaldo could not legally perform electrical work while waiting for the permit to be issued. By the time the permit was finally issued, DuBaldo was already three weeks into what had been estimated as a ten week job.[8] When the permit was issued, Montagno failed to update its original ten week schedule for DuBaldo to complete the job. Accordingly, we conclude that the court's finding was not clearly erroneous.

## B

The defendants next present several arguments contending that the court's finding that DuBaldo had substantially performed its contractual obligations was clearly erroneous because DuBaldo's own actions, as

---

[8] Undaunted by the court's finding to the contrary, the defendants argue that the court should have found that time was of the essence in the present matter. In finding that time was not of the essence, the court failed to elucidate its reasoning, and the defendants failed to request an articulation on that matter. On that basis, we conclude that the record is inadequate for our review. See *Celini* v. *Celini*, 115 Conn. App. 371, 380, 973 A.2d 664 (2009).

opposed to the permit's delay, caused it to fall behind schedule.

1

The defendants first argue that the court's finding was clearly erroneous because the delay of the permit did not preclude DuBaldo from otherwise manning the job. Specifically, the defendants contend that while waiting for the permit to be issued, DuBaldo delivered equipment to the site, began running conduit, performed layout work and began to install the Unistrut hardware,[9] each of which it had to perform regardless of the permit's issuance.[10] Moreover, the defendants assert that the court failed to indicate what other work DuBaldo could have performed had the permit been timely issued. We disagree.

The defendants' argument is without merit, as the record reveals the following facts. While waiting for the permit to be issued, DuBaldo could not perform electrical work. Robert DuBaldo, DuBaldo's principal, testified that the permit was delayed due to problems with Burlington Coat Factory's architectural drawings. He further testified that he had originally estimated that it would take five of his men ten weeks to complete the job. Limited to nonelectrical work without the permit, DuBaldo worked several days with between two and four men. Although the number of men working during

---

[9] On July 13, 2004, one day before the permit was issued, DuBaldo received permission from the Waterbury building inspector to install the Unistrut hardware.

[10] The defendants assert that there existed thirteen possible dates that DuBaldo could have worked while waiting for the permit's issuance on July 14, 2004. They further assert that DuBaldo worked 184 hours until the permit was issued, which was 648 hours fewer than originally estimated. The defendants base that calculation on DuBaldo's 3200 hour estimation to complete the job over a period of ten weeks, which, they contend, breaks down to 320 hours per week and sixty-four hours per day under a five day schedule. The permit's delay, which prevented DuBaldo from beginning electrical work, belies their claim.

that period was less than the five men that DuBaldo had originally estimated, Robert DuBaldo testified that had the permit been timely issued he would have been able to put more men on the job to perform electrical work. Significantly, in its memorandum of decision, the court found Robert DuBaldo "substantially credible . . . ." Further, as previously noted, Kurt Montagno testified that the permit's delay prevented DuBaldo from fully performing its contractual obligations. Specifically, Kurt Montagno testified that "[h]e knew when [DuBaldo] didn't have a permit at the project['s] start . . . that there was going to be a schedule issue [be]cause *the work just was not being hit full force.*" (Emphasis added.) Thus, the court had ample evidence to conclude that had the permit been timely issued, DuBaldo would have been able to perform such electrical work requiring a permit as it was contractually obligated to complete. Unable to pass on the credibility of witnesses or the weight with which the court affords evidence, we find no reason to disturb the court's finding. See *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007) (appellate court must defer to trier of fact's credibility assessment).

2

The defendants next claim that the court's finding was clearly erroneous because certain evidence revealed that DuBaldo did not significantly increase its manpower from the time the permit was issued on July 14, 2004, until the middle of August to make up for time lost. Specifically, the defendants contend that it was not until August 18, 2004, that DuBaldo significantly increased its manpower. We disagree.

"It is well established that the appellant bears the burden of providing an appellate court with an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to

state the basis of a decision . . . . Without an adequate record, [w]e . . . are left to surmise or speculate as to the existence of a factual predicate for the trial court's rulings. Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by the trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court, either on its own or in response to a proper motion for articulation, any decision made by us . . . would be entirely speculative." (Internal quotation marks omitted.) *Jezierny* v. *Jezierny*, 99 Conn. App. 158, 160–61, 912 A.2d 1127 (2007). Nowhere in the court's memorandum of decision is there any mention of DuBaldo's alleged failure to increase its manpower significantly from that period asserted by the defendants, and the defendants failed to seek an articulation related to this issue. We, therefore, must conclude that the record is inadequate for review.

3

The defendants finally claim that the court's finding was clearly erroneous because DuBaldo allegedly continued to mismanage the job after the accelerated schedule was put into effect. We disagree.

In support of their claim that DuBaldo mismanaged the job after the acceleration in schedule, the defendants refer to the following. They first note that on several occasions just prior to and after the accelerated schedule came into effect, Montagno and Burlington Coat Factory expressed concern about DuBaldo's alleged lack of progress and the number of men it had on the job. Specifically, the defendants allege that between August 10 and August 18, 2004, Burlington Coat Factory representatives expressed concern over DuBaldo's progress. Additionally, the defendants rely on Marotti's testimony that after evaluating DuBaldo's progress, at the request of Burlington Coat Factory, he concluded

that DuBaldo was in jeopardy of failing to complete its work on time. Finally, the defendants assert that there is certain evidence before the court allegedly indicating that DuBaldo's foreman, Monaco, was uncooperative, disobeyed orders and was unorganized.

The court made no reference in its memorandum of decision to either Marotti's evaluation of DuBaldo's progress or to Monaco's alleged failure to cooperate.[11] Although the court noted that Montagno, on August 18, faxed an "Action Required" notice to DuBaldo to comply with adequate levels of manpower, the court immediately thereafter noted that on August 18, DuBaldo had seven men on the job; on August 19, DuBaldo had eight men on the job; and on August 20, DuBaldo had ten men on the job. Those numbers exceeded the five men that DuBaldo originally esti-mated to work on the project. Nevertheless, the court did not make any finding as to whether those levels constituted adequate manpower, and the defendants failed to seek an articulation on any of those matters. Once again, we conclude that the record is inadequate for our review and refuse to speculate as to the court's legal conclusions.

## C

The defendants also argue that the court's finding was clearly erroneous because DuBaldo intentionally breached its contract with Montagno by disabling the fire alarm system, thereby rendering the doctrine of substantial performance inapplicable. Alternatively, the defendants contend that even if the doctrine of substan-tial performance is applicable, the bad faith allegedly demonstrated by DuBaldo is one factor among several that the court should have considered in finding that

---

[11] The court noted only that there was a personality clash between DuBaldo's foreman and Montagno's site superintendent.

DuBaldo failed to substantially perform its contractual obligations. We disagree.

The following additional facts are relevant for our resolution of the defendants' claim. On September 27, 2004, one day before Waterbury's scheduled inspection for the issuance of a certificate for the upper level of the subject premises, DuBaldo instructed Monaco to disable the fire alarm system. Just hours after the fire alarm system was disabled, it was made operational with Globe's assistance, and the scheduled inspection went along successfully and as planned. At trial, Robert DuBaldo testified that he instructed Monaco to disable the system because he believed that he was at risk to lose his license for working without a fire alarm permit. The court also heard testimony that DuBaldo's disabling of the fire alarm system constituted tampering and vandalism. In assessing that testimony, the court stated that "despite hours of conflicting testimony as to the incident with the fire alarm, [it] was unable to find any one witness' rendition of this event totally credible." Moreover, the court found that "although [DuBaldo's] actions in disconnecting the fire alarm finalized the breakdown that led to [DuBaldo's] termination from the job, that incidental action does not negate a finding of substantial performance."

Relying on *Vincenzi* v. *Cerro*, 186 Conn. 612, 442 A.2d 1352 (1982), the defendants assert that the doctrine of substantial performance is inapplicable because DuBaldo intentionally breached its contract with Montagno. Contrary to the defendants' assertion, the court in *Vincenzi* underscored that although our Supreme Court has "in several cases approved the common statement that a contractor who is guilty of a 'wilful' breach cannot maintain an action upon the contract . . . [t]he contemporary view . . . is that even a conscious and intentional departure from the contract specifications

will not necessarily defeat recovery, but may be considered as one of the several factors involved in deciding whether there has been full performance." (Citations omitted.) Id., 615–16. The *Vincenzi* court further noted that "[t]he pertinent inquiry is not simply whether the breach was 'wilful' but whether the behavior of the party in default 'comports with standards of good faith and fair dealing.' " Id., 616. We, therefore, conclude that the doctrine of substantial performance is applicable in the present case.

Alternatively, the defendants contend that the court's finding of substantial performance was clearly erroneous because DuBaldo demonstrated bad faith in disabling the fire alarm system. We remind the defendants that it is axiomatic that, as the appellants in this matter, they bear the burden of providing this court with an adequate record for review when presenting a claim that is based on a question of fact. See Practice Book § 61-10; *State* v. *Bonner*, 290 Conn. 468, 493, 964 A.2d 73 (2009). In the present case, the court noted that "[it] must consider any such fault or lack of good faith or fair dealing in determining the question of substantial performance." Although the court found that DuBaldo had intentionally disabled the fire alarm system, it emphasized that it was unable to determine DuBaldo's true motivation in so doing. Specifically, the court did not find any witness' rendition of the incident totally credible and analogized the conflicting testimony to a " 'riddle wrapped in a mystery inside an enigma . . . .' " Because the defendants have failed to satisfy their burden of providing this court with an adequate record for review, we refuse to entertain their claim.

## D

The defendants finally argue that the court's finding was clearly erroneous because the facts found by the

court indicate that DuBaldo fell short of achieving substantial performance of its contractual obligations under the legal standard set forth in *Pettit* v. *Hampton & Beech, Inc.*, 101 Conn. App. 502, 922 A.2d 300 (2007).[12] We disagree.

In *Pettit*, we found that the defendants were in substantial compliance with their contractual obligations, reasoning that their deficiencies in performance could be remedied for less than 5 percent of the amount sought in damages. Id., 509. Here, the defendants argue that DuBaldo's incomplete work was not minor in nature, as were the deficiencies in *Pettit*, and, therefore, the court's finding was clearly erroneous. In support of their claim, the defendants assert that the court improperly calculated the total percentage of work completed by DuBaldo at 81 percent upon termination. Specifically, the defendants claim that the court relied on the allegedly unsubstantiated testimony of Robert DuBaldo and Monaco to calculate the percentage of completed work and disregarded Marotti's conflicting testimony. Had the court relied on Marotti's testimony, as the defendants contend it should have, the total percentage of work completed by DuBaldo is 66 percent.

It is first important to note that the defendants do not contend that the 19 percent deficiency in DuBaldo's performance, as found by the court, was minor in nature. Instead, the defendants assert that the court should have calculated DuBaldo's deficiency at 34 percent, a percentage the defendants claim was not minor. As such, the defendants concede that the 19 percent deficiency in DuBaldo's performance was minor and does not negate a finding of substantial performance.

---

[12] Preliminarily, we acknowledge the defendants' argument that the certificate issued by Waterbury should not be viewed as an endorsement that DuBaldo substantially completed its work. Nevertheless, we agree with DuBaldo that issuance of the certificate played no part in the court's analysis concerning substantial performance.

In its memorandum of decision, the court found Robert DuBaldo "substantially credible" and Marotti "only sporadically credible." Contrary to the defendants' contention that the court should have relied on Marotti's testimony, "[t]he sifting and weighing of evidence is peculiarly the function of the trier." (Internal quotation marks omitted.) *Nanni* v. *Dino Corp.*, 117 Conn. App. 61, 68, 978 A.2d 531 (2009). Here, we abide by that principle and defer to the court's judgment.[13]

## II

The defendants next claim that the amount of damages the court awarded DuBaldo was clearly erroneous. We disagree.

"We begin by setting forth our standard of review. [T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . Thus, [t]he court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." (Citation omitted; internal quotation marks omitted.) *Duplissie* v. *Devino*, 96 Conn. App. 673, 699, 902 A.2d 30, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006).

The following facts are necessary for our resolution of the defendants' claim. In awarding $193,120.80 in damages to DuBaldo, the court recognized a credit to

[13] To the extent that the defendants argue that DuBaldo should be precluded from recovery because it intentionally failed in strict performance of its contractual obligations; see *Pettit* v. *Hampton & Beech, Inc.*, supra, 101 Conn. App. 508; we conclude that the defendants have briefed that matter inadequately and decline to address it. See *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 83 n.4, 612 A.2d 1130 (1992).

the defendants in the amount of $68,235.50, a figure it explained as consisting of $20,650 paid by Montagno to Globe for work completed prior to DuBaldo's termination, and $47,585 for the cost to complete thereafter. At trial, Montagno introduced several invoices that it had received from Globe for its work on the project. Evidence revealed that many of those invoices failed to detail what particular work Globe performed within the scope of DuBaldo's contract and, often, included only a list of first names and hours worked. Additional evidence revealed that Globe generally worked with no supervision. Kurt Montagno testified that despite such uncertainties, no effort was made to determine which work performed by Globe was actually within the scope of DuBaldo's contract. As such, the court found that "the backcharging scheme entered into as between Montagno and Globe was without rigor and most obviously manipulated by Globe to its financial advantage. That is, no independent or objective evidence, testimonial or documentary, introduced at trial supports the amounts billed by Globe that were backcharged . . . to DuBaldo." After assessing testimony that it considered credible, the court found that DuBaldo had completed 81 percent of its contractual obligations prior to termination. From that calculation, the court arithmetically determined the cost to complete the job subsequent to DuBaldo's termination, which it charged back against DuBaldo's account.

The defendants argue that the court erred in estimating the amount to be charged back against DuBaldo's account because it failed to recognize both certain work performed by Globe allegedly within the scope of DuBaldo's contract and additional costs incurred to complete the job allegedly caused by DuBaldo. Specifically, the defendants first contend that "the court's approach in arriving at a percentage of completion by multiplying square footage by approximate percentages

of completion prevented it from undertaking a careful analysis of the work performed and billed by Globe during September and thereafter. Once the court concluded that [DuBaldo] had completed 81 percent of its contractual scope, the value of the remaining 19 percent became a matter of a simple arithmetic exercise rather than an examination of what remained to be completed and corrected by Globe."[14] The defendants claim that evidence established that Montagno paid Globe $322,472.65, $201,945.62 of which they assert was within the scope of DuBaldo's contract and, thus, should be charged back against DuBaldo's account. In support of their claim, the defendants rely on certain invoices introduced at trial that the court either failed to apply or significantly discounted in its calculation. Next, the defendants allege that the court had before it evidence that Globe incurred additional costs totaling $26,435.85 in completing the job upon which it should have applied in its calculation. Such additional costs included payments for lift rentals, damage allegedly caused by DuBaldo to a sprinkler pipe, and premiums for the cost of a bond purchased by Montagno in substitution for DuBaldo's mechanic's lien. Essentially, the defendants ask that we retry the facts of this case. "As we have frequently stated, we cannot, and do not, retry the facts." *Fraulo* v. *Gabelli*, 37 Conn. App. 708, 718, 657 A.2d 704 (1995), cert. denied, 239 Conn. 947, 686 A.2d 125 (1996). The defendants' claim, therefore, fails.

## III

Next, the defendants raise two claims contending that the court's loss of efficiency award was clearly erroneous.

[14] Here, the defendants claim that the court should have relied on Marotti's testimony that 10 percent of the work completed by DuBaldo required correction by Globe.

## A

The defendants first argue that the court's finding of loss of efficiency was clearly erroneous because it improperly assumed that Burlington Coat Factory began fixturing as soon as DuBaldo commenced work in late June, 2004. We disagree.

The following additional facts are necessary for our resolution of the defendants' claim. Despite DuBaldo's delay in obtaining an electrical permit, Montagno failed to update its original ten week schedule and proceeded with fixturing of the upper level of the premises as originally scheduled.[15] Robert DuBaldo testified that the fixturing created difficulties in completing the job. Specifically, he testified that much of the work performed by his company required the use of man lifts and that Burlington Coat Factory's fixturing impeded the effectiveness of those lifts because he was forced to operate around the fixturing. Robert DuBaldo further testified that such difficulties caused him to expend at least 1000 additional man hours and resulted in a 30 percent loss of efficiency, costing an extra $25,000 to $30,000. Zachary Welburn, an independent electrical contractor hired by DuBaldo to work on the Burlington Coat Factory project for two weeks in September, and owner of Welburn Electrical Contractors, LLC, testified that store fixturing was taking place the entire time he was on the job. That fixturing, Welburn testified, was in his way and required that he put more time into the job than he would have otherwise because he had to work around it. Finally, despite Globe's long-standing relationship with Burlington Coat Factory, Marotti testified that fixturing of the store hampered his company's performance by 30 percent to 50 percent. That fixturing,

---

[15] Marotti testified that fixturing includes shelving, gondolas, cabinetry, cash registers, woodworking, desks and chairs, merchandise and anything else that merchandise may go on.

Marotti testified, made it difficult to maneuver in the store to do work. Marotti further testified that "everything in the whole store that we did . . . was an issue because they were stocking the store. When you get 200 to 300 people in there and there's truckloads coming in with pallets all over the place, [it makes working there difficult] . . . ." Based upon the testimony of Robert DuBaldo, Welburn and Marotti, which it deemed credible, the court found that DuBaldo suffered a 20 percent loss of efficiency as a result of the fact that Burlington Coat Factory began fixturing unreasonably early.

"We review damages awards under a well settled standard. [T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Russell* v. *Russell*, 91 Conn. App. 619, 643, 882 A.2d 98, cert. denied, 276 Conn. 924, 925, 888 A.2d 92 (2005). The defendants contend that the court's 20 percent lost efficiency finding was clearly erroneous because it assumed that Burlington Coat Factory's fixturing of the upper level of the premises began the very first day that DuBaldo started work when, in fact, it actually began in early September. As such, the defendants maintain that the court's method of multiplying the value of what it found DuBaldo to have completed by 20 percent was clearly erroneous.

On our review of the record, we conclude that the defendants' argument fails for the following reasons. The defendants raise this claim for the first time on appeal, have failed to request an articulation on this matter and have failed to seek review under the plain error doctrine. See Practice Book § 60-5. "To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." *Baker* v.

*Cordisco,* 37 Conn. App. 515, 522, 657 A.2d 230, cert. denied, 234 Conn. 907, 659 A.2d 1207 (1995). Additionally, the defendants cite no authority in support of their claim but, rather, merely offer bold assertions. We refuse to entertain abstract assertions absent any analysis. See *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.,* 227 Conn. 175, 181 n.4, 629 A.2d 1116 (1993) (argument devoid of analysis constitutes inadequate briefing); *State* v. *Adams,* 117 Conn. App. 747, 753, 982 A.2d 187 (2009) (analysis, not mere abstract assertion, required to avoid abandoning issue for failure to brief issue properly). Finally, and perhaps most significantly, there is ample evidence in the record on which the court could rely in finding that DuBaldo suffered 20 percent lost efficiency as a result of Burlington Coat Factory's unreasonably early fixturing. In particular, the court considered credible the testimony of Robert DuBaldo, Welburn and Marotti. We reiterate that "[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." *State* v. *Lawrence,* supra, 282 Conn. 155. For those reasons, the defendants' claim fails.

B

The defendants also argue that the evidence before the court was so lacking and speculative as to afford no basis to make any award for lost efficiency. We disagree.

We again note that "[t]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Internal quotation marks omitted.) *Russell* v. *Russell,* supra, 91 Conn. App. 643. "Speculative evidence is not sufficient evidence for the trier to make a fair and reasonable estimate of the plaintiff's damages . . . however,

[m]athematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate. . . . Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion." (Citations omitted; internal quotation marks omitted.) *Viejas Band of Kumeyaay Indians* v. *Lorinsky,* 116 Conn. App. 144, 163, 976 A.2d 723 (2009).

Initially, we address the defendants' assertion that this court should adopt the "measured mile" or "window method" standard of proof for loss of efficiency claims. Under that approach, lost efficiency is calculated by comparing actual productivity prior to disruption with productivity during periods of disruption. D. Rosengren, 13 Connecticut Practice Series: Construction Law (2005) § 4.9, p. 89. Once again, we remind the defendants of the requirement that "[the appellant] must raise in the trial court the issues that he intends to raise on appeal. . . . For us [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Jarvis* v. *Lieder,* 117 Conn. App. 129, 141, 978 A.2d 106 (2009). Notably, the defendants do not seek review of their unpreserved claim under the plain error doctrine. See Practice Book § 60-5. As such, the defendants have failed to preserve their claim that Connecticut should adopt the "measured mile" method.

The defendants also contend that the court's lost efficiency award was clearly erroneous because the evidence on which the court relied was so lacking in substance as to afford no basis for the court to make any award.[16] At oral argument before this court, the

---

[16] We acknowledge the defendants' reliance on *Net Construction, Inc.* v. *C & C Rehab & Construction, Inc.,* 256 F. Sup. 2d 350, 353 (E.D. Pa. 2003), and *Luria Bros. & Co.* v. *United States,* 369 F.2d 701, 712 (Ct. Cl. 1966). The facts of those cases, which constitute only persuasive authority, are not the facts of this case.

defendants decried the allegedly "appalling paucity of evidence" on which the court relied in finding DuBaldo to have suffered a 20 percent loss of efficiency. We dispose of that claim by again referring to the testimony of Robert DuBaldo, Welburn and Marotti, deemed credible by the court. Contrary to the defendants' contentions, the evidence before the court was sufficiently detailed and objective for the court reasonably to calculate DuBaldo's lost efficiency. We, therefore, conclude that the court's award for loss of efficiency was not clearly erroneous.

## IV

The defendants' next claim is that there was no evidence introduced at trial on which the liability of Hanover could be found. We disagree.

We are guided by the well established standard of review set forth in part I of this opinion. In particular, "we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole records, those facts are clearly erroneous." (Internal quotation marks omitted.) *Duplissie* v. *Devino*, supra, 96 Conn. App. 688.

The defendants contend that because no evidence was submitted to the court regarding the mechanic's lien and the bond, there existed no evidentiary basis to impose liability on Hanover.[17] Specifically, the defendants maintain that there is nothing in the record indicating that either DuBaldo's mechanic's lien or the bond furnished in substitution for it by Hanover were offered

---

[17] In its June 6, 2008 memorandum of decision, the court found: "As to unpaid amounts that, pursuant to the court's opinion in this matter, may be owed to [DuBaldo] by Montagno . . . and derivatively by the surety under the bond referenced in [DuBaldo's] complaint and [Hanover's] answer, the court enters judgment against the surety defendant, Hanover Insurance Company."

or admitted into evidence. The defendants also maintain that there is nothing in the record indicating that DuBaldo either requested the court to take notice of any pleadings or otherwise sought to introduce any pleadings into evidence.

We have observed that "[w]hile a complaint includes all exhibits attached thereto; Practice Book § 141 [now § 10-29]; *Redmond* v. *Matthies*, 149 Conn. 423, 425–26, 180 A.2d 639 (1962); this does not mean that such exhibits can be properly considered by the factfinder in lieu of evidence. Exhibits attached to a complaint can be considered by the factfinder if the defendant, through his answer or other responsive pleading, admits to the factual allegations contained therein so that the pleading constitutes a judicial admission. . . . Any allegation that is denied by the defendant, however, must be proved by the plaintiff." (Citations omitted.) *Streicher* v. *Resch*, 20 Conn. App. 714, 716, 570 A.2d 230 (1990).

In its March 26, 2007 answer to DuBaldo's second revised complaint, Hanover admitted the following facts: (1) Montagno filed an application for dissolution of a mechanic's lien on or about June 28, 2005; (2) Hanover issued a bond in the amount of $293,316.00 in place of the mechanic's lien on or about July 25, 2005; (3) DuBaldo released the mechanic's lien in place of the bond on or about July 25, 2005; and (4) that bond was attached to the complaint as exhibit C. Accordingly, we conclude that the answers provided by Hanover in its March 26, 2007 answer constitute judicial admissions that the court properly could consider in rendering judgment against Hanover.

V

We last address DuBaldo's cross appeal. DuBaldo argues that the court improperly determined that it was not entitled to attorney's fees pursuant to General

Statutes §§ 52-249 (a) or 52-249a, which codified Public Acts 2007, No. 07-120 (P.A. 07-120). We disagree.

We consider first DuBaldo's claim regarding § 52-249 (a). Although DuBaldo argued before the court that it was entitled to attorney's fees pursuant to § 52-249 (a),[18] the court, in its June 6, 2008 memorandum of decision, considered only whether DuBaldo was entitled to attorney's fees pursuant to § 52-249a.[19] "It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . ." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003); see Practice Book §§ 60-5 and 66-5. Here, DuBaldo failed to request an articulation concerning its entitlement to attorney's fees under § 52-249 (a). We, therefore, conclude that the record is inadequate to review that claim. See *Froom Development Corp.* v. *Developers Realty, Inc.*, 114 Conn. App. 618, 639, 972 A.2d 239 (court's failure to address plaintiff's motion for mistrial and plaintiff's failure to seek articulation on such provides inadequate record for review), cert. denied, 293 Conn. 922, 980 A.2d 909 (2009).

We next consider DuBaldo's claim that it is entitled to attorney's fees pursuant to § 52-249a. Specifically, DuBaldo contends that although § 52-249a was enacted after it filed its mechanic's lien and substituted a bond

---

[18] General Statutes § 52-249 (a) provides: "The plaintiff in any action of foreclosure of a mortgage or lien, upon obtaining judgment of foreclosure, when there has been a hearing as to the form of judgment or the limitation of time for redemption, shall be allowed the same costs, including a reasonable attorney's fee, as if there had been a hearing on an issue of fact. The same costs and fees shall be recoverable as part of the judgment in any action upon a bond which has been substituted for a mechanic's lien."

[19] The court noted: "[DuBaldo] bases its claim for attorney's fees on . . . § 52-249a . . . ."

in lieu thereof, the statute must be given retrospective effect. According to DuBaldo, it is entitled to attorney's fees because § 52-249a did not affect substantive rights but merely provided a procedural mechanism for the recovery of costs and attorney's fees by a successful applicant when a surety bond is substituted for a mechanic's lien. Furthermore, DuBaldo asserts that § 52-249a was enacted in response to judicial decision and, therefore, constitutes clarifying legislation.

"Whether to apply a statute retroactively or prospectively depends upon the intent of the legislature in enacting the statute. . . . In order to determine the legislative intent, we utilize well established rules of statutory construction. Our point of departure is General Statutes § 55-3, which states: No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have retrospective effect. The obligations referred to in the statute are those of substantive law. . . . Thus, we have uniformly interpreted § 55-3 as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only. . . . This presumption in favor of prospective applicability, however, may be rebutted when the legislature *clearly and unequivocally* expresses its intent that the legislation shall apply retrospectively. . . . Where an amendment is intended to clarify the original intent of an earlier statute, it necessarily has retroactive effect. . . . We generally look to the statutory language and the pertinent legislative history to ascertain whether the legislature intended that the amendment be given retrospective effect." (Emphasis added; internal quotation marks omitted.) *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 691–92, 755 A.2d 850 (2000). "While there is no precise definition of either [substantive or procedural law], it is generally

agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress. . . . Where the amendment is not substantive, i.e., not directed to the right itself, but rather to the remedy, it is generally considered a distinctly procedural matter." (Citations omitted; internal quotation marks omitted.) *Davis* v. *Forman School*, 54 Conn. App. 841, 854–55, 738 A.2d 697 (1999).

The statutory language of § 52-249a is silent as to whether it is intended to apply retrospectively. It provides: "A plaintiff who prevails in any action upon a bond which has been substituted for a mechanic's lien shall be allowed costs and a reasonable attorney's fee." General Statutes § 52-249a. Nor does P.A. 07-120 shed any additional light on the matter. It adds only that it is to be effective October 1, 2007. Similarly, the legislative history contains no clear and unequivocal express intent concerning the temporal application of § 52-249a.

We next consider whether the legislature intended § 52-249a to substantively change the law or to clarify its original intent of an earlier statute. "[A] factor [that] we have deemed to be significant in determining the clarifying character of legislation is that the legislation was enacted in direct response to a judicial decision that the legislature deemed incorrect." *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, supra, 253 Conn. 693; see also *Middlebury* v. *Dept. of Environmental Protection*, 283 Conn. 156, 172, 927 A.2d 793 (2007) (whether legislation enacted in direct response to judicial decision is factor to consider); *Toise* v. *Rowe*, 243 Conn. 623, 628, 707 A.2d 25 (1998) (reasonable to conclude prompt legislative response to controversy regarding interpretation of original act evinces legislative intent to clarify meaning of act); *Reliance Ins. Co.* v. *American Casualty Co. of Reading, Pennsylvania*, 238 Conn. 285, 290, 679 A.2d 925 (1996) (legislation

enacted soon after controversies arose regarded as legislative interpretation of original act); but see *In re Michael S.*, 258 Conn. 621, 629, 784 A.2d 317 (2001) (legislature's change to language of statutory provision in response to judicial decision interpreting that provision insufficient to overcome presumption against retroactive applicability); *Colonial Penn Ins. Co.* v. *Bryant*, 245 Conn. 710, 720, 714 A.2d 1209 (1998) (same).

Admittedly, the legislative history surrounding § 52-249a is murky. Certain portions of the legislative history support the claims of each party. In support of DuBaldo's contention that § 52-249a was enacted in direct response to *A & A Mason, LLC* v. *Montagno Construction, Inc.*, 49 Conn. Sup. 405, 889 A.2d 278 (2005), a case in which the court found that a right to attorney's fees in an action on a bond did not exist under § 52-249 (a), are the comments of Representative Gerald M. Fox III. He stated: "There are certain situations where a mechanic's lien may be substituted with a bond, and there have been interpretations by the courts that when a bond is substituted that the provision allowing for costs and reasonable attorney's fees no longer applies. In order to clarify the way that that has been interpreted, this bill was presented to us." 50 H.R. Proc., Pt. 7, 2007 Sess., p. 2305. Representative Fox added: "What this bill did was to clarify the situation in that a plaintiff would also be allowed to recover costs and reasonable attorney's fees with respect to an action when a surety bond has been substituted."[20] 50 H.R. Proc., Pt. 16, 2007 Sess., p. 5199. Notwithstanding those statements, the legislative history supports the defendants' assertion that § 52-249a substantively changed the law. In particular, Senator Andrew J. McDonald's comments indicate that the legislature understood that

[20] The defendants concede that § 52-249a was enacted in response to the *A & A Mason, LLC,* case.

it was creating a new right that did not previously exist. Senator McDonald noted: "[I]t's the case that you can bring an action to foreclose on a mechanic's lien, and when you do so, our statutes allow for a plaintiff to recover a reasonable attorney's fee. It's also the case that when you substitute a bond for a mechanic's lien, if you have to bring an action on the bond, it does not include any provision for the recovery of an attorney's fee. And this bill is intending to bring those two processes into consideration, or synch, I should say." 50 S. Proc., Pt. 9, 2007 Sess., pp. 2834–35. Based on the contradictory statements of Representative Fox and Senator McDonald, we are unable to conclude that § 52-249a was enacted to clarify the original intent of § 52-249 (a). Cf. *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, supra, 253 Conn. 692 (finding persuasive direct, unequivocal statements concerning legislation's clarifying purpose absent contradictory legislative history); *Toise* v. *Rowe*, supra, 243 Conn. 631 (same). The legislative history of § 52-249a plainly is not a clear and unequivocal expression of intent.

Relying on *Davis* v. *Forman School*, supra, 54 Conn. App. 841, DuBaldo additionally contends that § 52-249a affects only matters of procedure and, thus, must apply retrospectively. More specifically, DuBaldo argues that § 52-249a did not affect substantive rights because the right to receive attorney's fees allegedly already existed in § 52-249 (a). According to DuBaldo, the enactment of § 52-249a was remedial legislation entitled to retroactive application. Further, DuBaldo asserts that § 52-249a clarified the legislature's original intent of § 52-249 (a) that no hearing on the form of judgment or time of redemption is needed to trigger the entitlement to attorney's fees in an action on or a bond substituted for a mechanic's lien. Unlike the legislation at issue in *Davis*, § 52-249a effected a change in the substantive rights of the parties. Our courts consistently have found that

§ 52-249 (a) does not allow recovery for attorney's fees when a bond is substituted for a mechanic's lien. See *A & A Mason, LLC* v. *Montagno Construction, Inc.*, supra, 49 Conn. Sup. 410. We agree with those portions of the legislative history and the court's finding that "[§] 52-249a . . . was enacted separately to allow what § 52-249 (a) would not," and, therefore, created a new substantive right. Unable to conclude that § 52-249a is to apply retrospectively, we must presume that the legislature intended only prospective application. See *In re Daniel H.*, 237 Conn. 364, 372, 678 A.2d 462 (1996).

The judgment is affirmed.

In this opinion the other judges concurred.